NEWTON S. HAWKINS, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] On a trial for murder, it is not competent, in order to reduce the homicide to manslaughter, to ask a witness if, from the conduct, countenance and language of the deceased, he did not believe it was his intention to kill the prisoner? The witnesses must testify to facts, and not give their opinion.

[2.] Provocation by threats will not be sufficient to reduce the crime from murder to manslaughter, where the person killed is unarmed, and neither making or attempting any violence upon the prisoner, at the time of the killing.

[3.] If sufficient time has elapsed for reason to resume her sway, the killing will be attributed to deliberate revenge, and punished as murder.

[4.] Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

Murder, from Gordon county. Tried before Judge TRIPPE, September Term, 1857.

The plaintiff in error was tried and convicted in the Court below, of the murder of Absalom W. Scott. The facts of the case, as appeared by the evidence, were as follows:

Hawkins and Scott were gambling in a crib in the yard, when some altercation ensued, which ended in a fight; Hawkins got out of the crib and gathered up some rocks or brickbats; Scott told Hawkins to lay down the rocks, and he would come out; Hawkins laid them down, but Scott remained in the crib; Hawkins then took a stick and went up to the door of the crib and struck at Scott, and "punched" at Scott with the stick through the cracks of the crib; Hawkins then took some rocks and threw them at Scott in the crib; after throwing the rocks, Hawkins left the yard and went to his house, some 250 yards off; Scott said that Hawkins was too mean to live in the county, and that he intended to kill him; just as Scott said this, Hawkins was coming towards him, and was about 24 steps from him; Hawkins had a horse pistol in his hand, and when he came within about 10 feet of Scott, he raised it and shot him; the shot took effect in the left breast of Scott, who fell dead, moving only three or four steps. The witnesses stated their belief that Hawkins was sufficiently near to hear the threat of Scott to kill him.

Defendant's counsel proposed to ask two of the witnesses whether, from the conduct, countenance and language of the deceased, immediately preceding the homicide, they (the witnesses) believed the deceased intended to kill the accused. On each occasion the Court refused to allow the question to be put, to which refusals the defendant's counsel excepted.

The cause being closed, the Court charged the jury, *(inter alia,)* " that if they (the jury) should find, that between the provocation given and the killing, there was sufficient time for the voice of reason and humanity to have resumed her sway, whether in this case she had done so or not, the killing was murder, and not manslaughter." To which charge defendant's counsel excepted.

The jury found the defendant guilty of murder.

Defendant's counsel moved for a new trial, on the ground of error in the rulings and charge above excepted to. This motion the Court refused, and the defendant's counsel filed his bill of exceptions, assigning the same as error.

WALKER & FRANCIS, for plaintiff in error.

Sol. Gen. LONGSTREET, for the State.

*By the Court.*—LUMPKIN J. delivering the opinion.

It seems in this case, that prisoner and deceased were gambling in a crib; a quarrel and fight took place; Hawkins came out and threw stones or brick-bats at Scott, and punched him through the cracks of the crib. The last stone thrown was supposed to have hit Scott, as he did not speak afterwards. Hawkins then left for his house, saying he would be back in a little while; Scott came out, and was standing with the witness Baldwin, when Hawkins returned with two horseman's pistols in his hands, loaded with buck shot; when he got within 23 or 24 steps of Scott, Scott remarked that Hawkins was too mean to live, and that he intended to kill him; witness does not know whether Hawkins heard this remark, but thinks he might have heard it; Hawkins fired and killed Scott, eight of the shot taking effect; and upon this testimony he was found guilty of murder by the jury.

A new trial was moved for on two grounds. First, because the Court refused to allow defendant's counsel to ask the witnesses, who were present at the killing, whether, from the conduct, countenance and language of the deceased, immediately preceding the homicide, they believed deceased intended to kill the accused. Second, because the Court charged the jury, that if they should find, that between the provocation given and the killing, there was sufficient time for the

voice of humanity to have been heard, and reason to have re-sumed her sway, whether in this case the fact was so or not, the killing was murder, and not manslaughter.

The application was refused, and to reverse this judgment this writ of error is prosecuted.

[1.] Was the Court right in refusing to allow the witnesses to testify as to their belief, as to what was the purpose and intention of Scott?

In *Hudgins vs. The State*, 2 *Kelly's Rep.* 173, this Court held, that the opinion of a witness, as to the intention of the deceased in approaching the slayer, is not admissible. The same rule is laid down in the case of *The State vs. Scott*, 4 *Iredell's Law Rep.* 409. The Court say, " the belief that a person designs to kill me, will not prevent my killing him from being murder, unless he is making some attempt to ex-ecute his design; or at least, is in an apparent situation to do so; and thereby reasonably induces me to think that he in-tends to do it immediately."

Here, there was certainly no such purpose in the mind of the deceased, as he had no weapon of any sort. Prisoner must have known that Scott was unarmed. The witnesses were not asked, if they thought that Scott intended to kill Hawkins, *at the time* of the homicide? To such a ques-tion there could have been but one answer.

[2.] As to the charge of the Court, it was in the terms and language of the code. See 4 *Division, Section* 7, *Cobb's Di-gest*, 783–4. Provocation by threats will not be sufficient to free the slayer from the guilt of murder. And if sufficient time has elapsed for reason to resume her sway, the killing shall be attributed to deliberate revenge, and punished as murder. Here, the menaces were evidently made after Haw-kins had determined to kill Scott, for they were made after he returned from his house with deadly weapons; and it was very doubtful whether the words of Scott were heard at all by Hawkins. They were addressed to the witness, and

not to Hawkins. See *Russell on Crimes*, 433, 442, *and the authorities there cited; Wharton's American Crim. Law,* 375, 377; *Roscoe's Crim. Ev.* 724, 729, 730, 731.

But what provocation was given in this case, to justify the uncontrollable passion, relied on in this case, in mitigation of this homicide? Hawkins seemed to have got the best of the fight in the crib; he continued to assault Scott after he came out; he left him in the crib, hastened home, a distance of 250 yards, procured his pistols, returns and executes his murderous purpose, evidently formed before he left Scott. It will never do to tolerate such a plea, I had almost said, pretense; no, never. *Ray vs. The State*, 15 *Ga. Rep.* 244, 245.

Human life is sacrificed at this day, throughout the land, with more indifference, than the life of a dog, especially if it be a good dog. Scott may not have been a good citizen, still he was a human creature, under the protection of the laws of the State; and even in his person, the punitory power of the government must be vindicated. Cain was the first murderer, but who is the last, is known only to those who have read the morning papers. If this crime goes unpunished, let our skirts, at least, be free from the stain of blood-guiltiness.

Judgment affirmed.

NOTE.—This opinion was delivered at the opening of the Court in the morning. At noon, Judge L. picked up the Augusta Chronicle & Sentinel of that day, and the following was the first article which arrested his attention:

"FATAL ACCIDENT.—The West Point Citizen of Saturday says:—We learn that a Mr. Brawner, a teacher by occupation, was fatally stabbed on last Monday evening, by one of his students only twelve years old. The circumstances connected with this case are as follows: While the boys were at play, during recess, Mr. Brawner heard the little boy making use of profane language; he addressed the boy, William Collins, and asked him what he said. The lad repeated the oath; whereupon, the teacher said to him, 'William, come into the house, and I will settle with you.' The lad walked to the school room, and while on the way, report says that a larger boy said to William, 'if he attempts to whip you, stick your knife in him.' Mr. Brawner struck him once or twice with a switch; William returned the blow, and made his escape by running off. Mr. B. ran after him some distance, and on his return was observed to fall several times. He died from a stab received in the left breast, before reaching the school house.

"We learn that Mr. Brawner was raised near Elberton, Elbert county, Georgia. He was an estimable young man, beloved by all who knew him, and was a particular favorite with William's parents, as he had been chief attendant at a wedding party only four days previous to his death, at the marriage nuptials of William's sister. This said accident occurred near Berlin, Chambers county, Alabama."