**Virgil Delano PRESNELL, Jr., Petitioner–Appellee, Cross–Appellant,**

v.

**Walter ZANT, Warden, Georgia Diagnostic and Classification Center, et al., Respondents–Appellants, Cross–Appellees.**

No. 90–8770.

United States Court of Appeals, Eleventh Circuit.

April 15, 1992.

---

Paula K. Smith, Asst. Atty. Gen., Susan V. Boleyn, Atlanta, Ga., for respondents-appellants, cross-appellees.

John L. Taylor, Jr., Vincent, Chorey, Taylor & Feil, Mildred A. Hankins, Atlanta, Ga., for petitioner-appellee, cross-appellant.

Before TJOFLAT, Chief Judge, KRAVITCH and HATCHETT, Circuit Judges.

TJOFLAT, Chief Judge:

Virgil Delano Presnell, Jr., is a Georgia prison inmate. Presnell stands convicted of murder, statutory rape, kidnapping with bodily injury, and kidnapping. He faces a death sentence on the murder conviction, and prison sentences on the remaining convictions.

The United States District Court for the Northern District of Georgia granted Presnell's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988) with respect to the death sentence, but denied relief with respect to Presnell's convictions and remaining sentences. Respondent Zant appeals from those portions of the district court's order granting habeas relief, and Presnell cross-appeals from the portions of the same order denying relief. We affirm the district court's judgment.

## I.

On July 1, 1976, petitioner was indicted in Cobb County, Georgia, for the capital offenses of murder, rape,[1] and kidnapping with bodily injury,[2] and for the offenses of kidnapping and aggravated sodomy. One week before trial, aggravated sodomy was dropped from the indictment. A jury subsequently found petitioner guilty on all four remaining counts. At the penalty phase of petitioner's trial, the judge instructed the jury on the statutory aggravating circumstance that could warrant the imposition of death sentences for murder, rape, and kidnapping with bodily injury: "[t]he [capital] offense ... was committed while the offender was engaged in the commission of another capital felony." Ga. Code, § 27–2534.1(b)(2) (1975). Specifically, the judge instructed the jury that it could impose the death penalty (1) for the murder, if it was committed while petitioner was engaged in the commission of the "kidnapping with bodily harm, aggravated sodomy"; (2) for the rape, if it was committed while petitioner was engaged in the commission of the murder; and (3) for the kidnapping with bodily injury, if it was committed while petitioner was engaged in the commission of the rape. The jury found that all three offenses had been committed while petitioner had been engaged in the commission of the offenses specified in the instruction, and imposed death sentences for murder, rape, and kidnapping with bodily injury. The judge also imposed a twenty-year concurrent sentence for kidnapping.

On direct appeal, the Georgia Supreme Court held that the judge had not requested that the jury specify whether it found

1. Between petitioner's sentencing and the Georgia Supreme Court's decision on direct appeal, the United States Supreme Court held that forcible rape could not constitute a capital felony. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

2. As acknowledged by the Georgia Supreme Court in *Collins v. State,* 239 Ga. 400, 236 S.E.2d 759 (1977), *Coker* also robs kidnapping with bodily injury of its status as a capital offense.

petitioner guilty of statutory or forcible rape. *Presnell v. State,* 241 Ga. 49, 243 S.E.2d 496, 501–02, *rev'd in part on other grounds,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978). Giving petitioner the benefit of the doubt, the court interpreted the jury's verdict as convicting petitioner of statutory, rather than forcible, rape. *Id.,* 243 S.E.2d at 502. Since statutory rape does not constitute a capital felony under Georgia law, the death penalty for kidnapping with bodily injury was now left without the support of a statutory aggravating factor. As a result, the court vacated the conviction of and the death penalty for rape, as well as the death penalty for kidnapping with bodily injury, and remanded the case with the instruction to impose a sentence for statutory rape and to resentence petitioner for kidnapping with bodily injury. Significantly, the court left undisturbed petitioner's death penalty for murder and his conviction of kidnapping with bodily injury. *Id.* at 502, 508.

After the Georgia Supreme Court had denied his motion for rehearing, the United States Supreme Court granted Presnell's petition for a writ of certiorari. The Supreme Court reversed the affirmance of petitioner's conviction of kidnapping with bodily injury and of petitioner's death penalty for murder, and remanded the case "for further proceedings not inconsistent with this opinion." *Presnell v. Georgia,* 439 U.S. 14, 17, 99 S.Ct. 235, 237, 58 L.Ed.2d 207 (1978).

On remand, the Georgia Supreme Court vacated that portion of its earlier opinion "[in] which [it] seemingly [had] held that aggravated sodomy was not bodily injury within the meaning of the crime of kidnapping with bodily injury." *Presnell v. State,* 243 Ga. 131, 252 S.E.2d 625, 626, *cert. denied,* 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 115 (1979). Harking back to the trial judge's instructions, which had identified the aggravating circumstance supporting the death penalty for murder as "kidnapping with bodily harm, aggravated sodomy," the court once again affirmed the conviction of kidnapping with bodily injury

and the death penalty for murder, because "[a]ggravated sodomy may supply the element of bodily injury required by the kidnapping offense, and there is ample evidence in the record of such bodily injury." *Id.,* 252 S.E.2d at 627.

After the United States Supreme Court denied certiorari from the Georgia Supreme Court's decision on remand, petitioner unsuccessfully pursued state post-conviction remedies, and, on June 15, 1981, filed his first federal habeas petition. This petition was dismissed without prejudice for failure to exhaust state court remedies. Petitioner then returned to state court, but saw his state habeas action dismissed yet again.

Petitioner filed the present federal habeas petition on May 15, 1985 in the United States District Court for the Northern District of Georgia. In this petition, Presnell mounted numerous challenges against his convictions and sentences. Denying petitioner relief on all other grounds, the district court held that the prosecutor's error of quoting certain language from *Eberhart v. Georgia,* 47 Ga. 598 (1873), during the sentencing phase required reversal of petitioner's death sentence under *Drake v. Kemp,* 762 F.2d 1449 (11th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986), and *Wilson v. Kemp,* 777 F.2d 621 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986).

Respondent Zant appeals the district court's decision to grant relief as to petitioner's death sentence. On cross-appeal, petitioner presents six claims: (1) the Georgia Supreme Court ignored the mandate of the United States Supreme Court by reinstating both petitioner's conviction for kidnapping with bodily injury and his death sentence for murder; (2) petitioner received ineffective assistance of counsel at the guilt phase of his trial in violation of the Sixth and Fourteenth Amendments; (3) the trial court's order to compel a psychiatric examination of petitioner violated petitioner's privilege against self-incrimination under the Fifth and Fourteenth Amendments; (4) the trial court's denial of petitioner's

motion for change of venue violated petitioner's rights under the Sixth and Fourteenth Amendments; (5) the district court improperly disposed of certain claims without an evidentiary hearing; and (6) the composition of petitioner's grand and traverse juries violated petitioner's rights under the Fourteenth Amendment.

Petitioner also mounts two additional attacks against his death penalty: (1) the reinstatement of petitioner's death penalty constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; and (2) the reinstatement of petitioner's death penalty constituted double jeopardy in violation of the Fourteenth Amendment. As the writ issues with respect to petitioner's death sentence on other grounds, we need not, and do not, address these claims.

We first address the *Eberhart* issue. We then turn to petitioner's attacks on his conviction.

## II.

██ Petitioner argues that the following summation in the prosecutor's closing argument at the sentencing phase of petitioner's trial constituted reversible error:

[M]y feelings, ladies and gentlemen, probably are best summed up in the words of a Supreme Court Justice many years ago, in 1873, he wrote an opinion in the case of Eberhart V. The State of Georgia, and while this is more than one hundred years ago, it, in my opinion, fits this situation that we have here today, and it says, reading at page [610] and Volume 47 of the Georgia Reports: "We have, however, no sympathy with that sickly sentimentality that springs into action whenever a criminal is at length about to suffer for crime. It may be a sign of a tender heart, but it is also a sign of one not under proper regulation. Society demands that crime shall be punished and criminals warned, and the false humanity that starts and shudders when the axe of justice is ready to strike, is a

dangerous element for the peace of society. We have had too much of this mercy. It is not true mercy. It only looks to the criminal, but we must insist upon mercy to society, upon mercy [sic] to the poor woman whose blood cries out against her murderers. That criminals go unpunished is a disgrace to our civilization, and we have reaped the fruits of it in the frequency in which bloody deed [sic] occur. A stern, unbending, unflinching administration of the penal laws, without regard to position or sex, as it is the highest mark of our [sic] civilization, it [sic] is also the surest mode to prevent the commission of offenses." [3]

The factors governing our review of federal habeas claims attacking a prosecutor's closing argument have been clearly enunciated in *Wilson v. Kemp,* 777 F.2d 621, 623 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986):

A prosecutor's argument violates the Constitution if it renders the defendant's trial "so fundamentally unfair as to deny him due process." [*Brooks v. Kemp,* 762 F.2d 1383, 1400 (11th Cir.1985) (en banc) ] (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974)) [, *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986) ]. Improper argument by a prosecutor reaches this threshold of fundamental unfairness if it is "so egregious as to create a reasonable probability that the outcome was changed." *Id.* at 1403. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984).

The methodology we have adopted for applying these constitutional standards is to determine first whether particular arguments by a prosecutor were improper and if so, to determine what the probable effect of the improper argument was on

---

**3.** As indicated, the prosecutor's attempted quotation from *Eberhart* contains several errors. For

the original passage, see *Eberhart,* 47 Ga. at 610.

the jury. *See Brooks v. Kemp,* 762 F.2d at 1403.

We have considered similar attacks on a prosecutor's use of substantially identical language from *Eberhart v. State* on numerous prior occasions. *See Wilson,* 777 F.2d at 621; *Bowen v. Kemp,* 769 F.2d 672 (11th Cir.1985), *rev'd in part on other grounds,* 832 F.2d 546 (11th Cir.1987) (en banc), *cert. denied,* 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988); *Drake,* 762 F.2d at 1449; *Potts v. Zant,* 734 F.2d 526 (11th Cir.1984), *cert. denied sub nom. Potts v. Kemp,* 475 U.S. 1068, 106 S.Ct. 1386, 89 L.Ed.2d 610 (1986). Our previous encounters with petitioner's claim compel the conclusion that the prosecutor's recital of a passage from *Eberhart v. State,* 47 Ga. 598, 610 (1873), rendered the sentencing phase of petitioner's trial fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment.

The prosecutor's use of the *Eberhart* quote in his closing argument to the jury clearly was highly improper. *Wilson,* 777 F.2d at 624; *Drake,* 762 F.2d at 1460; *Bowen,* 769 F.2d at 681; *Potts,* 734 F.2d at 535. In our assessment of its prejudicial effect, we turn to our prior bouts with *Eberhart* for guidance.

In three out of our four dealings with *Eberhart* to date, we found sufficient prejudice to warrant issuance of the writ with respect to the sentence imposed. Immediately preceding his closing argument to the jury, the prosecutor in *Potts* read to the court not only the *Eberhart* quote, but also excerpts from *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Without addressing the propriety of using the *Gregg* excerpt or considering whether the prosecutor had identified the author of the *Eberhart* quote, we held that the prosecutor's use of the *Eberhart* language alone had rendered the petitioner's trial fundamentally unfair. *Potts,* 734 F.2d at 535, 536. We characterized the prosecutor's tactic of reading the improper passages to the court in the jury's presence instead of directly addressing them to the jury as an "obvious subterfuge." *Id.* at 536.

In *Drake,* the prosecutor's closing argument to the jury included the *Eberhart* passage and a passage from another nineteenth century opinion by the Georgia Supreme Court, *Hawkins v. State,* 25 Ga. 207 (1858). The prosecutor attributed the *Eberhart* quote to "the Justice of the Supreme Court of Georgia," *Drake,* 762 F.2d at 1458, and the *Hawkins* excerpt to "the Supreme Court of Georgia," *id.* After considering the quotes' impact in light of the facts of the case, we reversed the district court's denial of the writ with respect to the death penalty.

Most recently, in *Wilson,* the prosecutor, as his colleague had done in *Potts,* quoted excerpts from *Gregg* in addition to the infamous *Eberhart* language. The prosecutor also identified the author of the *Eberhart* passage as "a noted legal scholar in the 1800's." *Wilson,* 777 F.2d at 623. Reserving judgment on the prejudicial effect of each quotation in isolation, we found that the *Eberhart* and *Gregg* quotations in conjunction constituted reversible error. *Id.* at 627.

Only in *Bowen* did we not find undue prejudice in a prosecutor's use of *Eberhart. Bowen,* however, is clearly distinguishable from the present case. In *Bowen,* the prosecutor's closing argument included a short passage containing paraphrased excerpts from *Eberhart.* The prosecutor did not claim to read these excerpts from an opinion by the Georgia Supreme Court, but merely attributed the excerpts to "one of our noted justices" and "a justice." *Bowen,* 769 F.2d at 681. In contrast, the prosecutor in the present case read the jury a lengthy and literal quotation from "an opinion in the case of Eberhart V. The State of Georgia" authored by "a Supreme Court Justice many years ago."

The present case more closely resembles *Drake,* which, according to *Bowen* itself, "is easily distinguished from [*Bowen*]." *Id.* at 683 n. 5. As *Bowen* points out, "[t]he prosecutor in *Drake* [and in the present case] specifically invoked the office of the Supreme Court of Georgia in support of his argument [, whereas] the prose-

cutor [in *Bowen* ] referred only to a 'noted justice.' " *Id.* Moreover, as *Bowen* remarks, "[t]he prosecutor in *Drake* [and in the present case] specifically stated that the Supreme Court of Georgia regarded the kind of mercy adverted to as not true mercy." *Id.* In *Bowen,* however, "no mention was made of mercy, except that society occasionally should be the object of mercy, as well as a criminal defendant." *Id.*[4]

All similarities between the present case and *Drake* aside, a consideration of the prosecutor's use of the *Eberhart* quote in the context of the entire sentencing phase brings home the quote's prejudicial impact. The sentencing hearing clearly focused on the issue of mercy. *Eberhart's* improper suggestion that the jury must exclude any consideration of mercy from its sentencing decision therefore in effect deprived petitioner of his only remaining plea for life. At the hearing, petitioner produced three witnesses, none of whom challenged any of the aggravating circumstances alleged by the State, and all of whom were designed to appeal to the jury's mercy. Dr. Harry Porter, a psychiatrist, testified that he had diagnosed petitioner as suffering from pedophilia, a medical condition he considered curable. Dr. Porter also testified that he did not believe petitioner had intended to harm his victims, and characterized petitioner as a very compliant individual who could function satisfactorily in a controlled environment. Dr. Miguel A. Bosh, another psychiatrist, also testified to the treatability of pedophilia. Rev. John T. Welch, a Baptist minister who had supervised petitioner for twelve months at a mission for juvenile delinquents, testified that he had baptized petitioner and described petitioner as "easily swayed." Finally, petitioner's mother, Lois Cole, spoke of her son's troubled childhood in a broken home without the benefit of fatherly guidance for most of his youth, and his academic problems lead-

ing to the failure of "two or three different grades."

Both closing arguments similarly revolved around the mercy issue. The prosecutor argued against the relevance of a troubled childhood for sentencing purposes. Perhaps most significantly, the *Eberhart* quote's denunciation of mercy not only concluded the prosecutor's argument, but also accounted for almost two of the argument's ten pages of trial transcript.

In response, the closing argument for the defense amounted to little more than a plea for mercy. The defense attorney's brief recapitulation of the mitigating testimony by the two psychiatrists, the minister, and petitioner's mother appeared sandwiched between explicit pleas for mercy: first, "All I can do is stay here in these few moments that are allotted me to plead for his life, as his mother would like to do, as his grandmother would like to do," and, again, "I ask you for mercy for this boy. I don't say he is entitled to mercy, mercy is something that is freely given from someone somewhere." The defense attorney summed up his closing argument with this appeal to the jury's capacity for mercy:

> Mercy is a sweet thing for a person who receives it. There have been many times that I have been the beneficiary of mercy. People have had mercy on me at various times. Not because I necessarily deserved it. But, again, remember, it is better to give it—you won't have to go home at night knowing that you killed somebody that might be subject to being rehabilitated, someone to be trusted, someone to be cured. As the physicians have told you, and you may not like psychiatrists, psychiatrists have done marvelous things for many people, the boy can function well in a controlled environment. For that reason we ask you not to impose the death penalty, *that you extend him the silken glove of mercy and not the naked nailed hands.* (Emphasis added.)

**4.** The State's attempt to distinguish the present case from *Wilson, Drake,* and *Potts* on the ground that the jury in the present case was charged on the appropriateness of considering mercy fails. Neither *Wilson,* or *Drake,* or *Potts*

turned on the presence or absence of a mercy instruction. Moreover, record excerpts submitted by petitioner establish that mercy instructions in fact were given in each of these three cases.

Considering the central role of the mercy issue in the sentencing phase of petitioner's trial, the prosecutor's heavy, and clearly improper, reliance on the *Eberhart* quote's anachronistic denunciation of mercy as a relevant sentencing consideration "undermine[s] confidence in the outcome" of the sentencing proceeding. *See Drake,* 762 F.2d at 1461 (citing *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)). The use of the *Eberhart* language therefore rendered petitioner's sentencing proceeding fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment.

### III.

### A.

■ Petitioner argues that the Georgia Supreme Court ignored the United States Supreme Court's mandate in *Presnell v. Georgia,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978), when it reinstated petitioner's conviction of kidnapping with bodily injury and petitioner's death penalty for murder. We disagree.

The reinstatement of petitioner's conviction of kidnapping with bodily injury and of his death penalty for murder is not necessarily inconsistent with the Supreme Court's decision in *Presnell v. Georgia* and therefore cannot be said to disregard the Supreme Court's instruction in that case to conduct proceedings "not inconsistent with this opinion." 439 U.S. at 17, 99 S.Ct. at 237. On remand, the Georgia Supreme Court could have taken at least two routes, both of which would have been consistent with the Supreme Court's directive. Under the first scenario, the Georgia Supreme Court simply changed its mind on a question of state law, i.e., it could have decided that aggravated sodomy, after all, "may supply the element of bodily injury required by the kidnapping offense." *Presnell v. State,* 243 Ga. 131, 252 S.E.2d 625, 627, *cert. denied,* 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 115 (1979); *see Presnell v. Georgia,* 439 U.S. at 15 & n. 2, 99 S.Ct. at 236 & n. 2 (Georgia Supreme Court "unequivocally" held that "the State could not rely upon sodomy as constituting the bodily injury associated with the kidnapping"). Having arrived at this conclusion, the court then reviewed the record and found "ample evidence ... of such bodily injury." *Presnell v. State,* 243 Ga. 131, 252 S.E.2d at 627.

In the second scenario, the court did not change its interpretation of state law at all, as it all along had considered aggravated sodomy a possible basis for the bodily injury component of the crime of kidnapping with bodily injury. *See id.* 252 S.E.2d at 626 (in its first opinion, Georgia Supreme Court only "seemingly held that aggravated sodomy was not bodily injury within the meaning of the crime of kidnapping with bodily injury"). Instead of changing its mind on the law, the Georgia Supreme Court uncovered new factual support from the record. In its first review of the record, the Georgia Supreme Court had reviewed the record to determine the factual basis for a finding of forcible rape as the bodily injury component. The United States Supreme Court's decision, however, had barred the use of forcible rape as a basis for the bodily injury component of the kidnapping offense in this case on federal constitutional grounds. *Presnell v. Georgia,* 439 U.S. at 16–17, 99 S.Ct. at 236–37. The second time around, the Georgia Supreme Court conducted a further review of the record, this time for the purpose of determining whether the record provided a factual basis for a finding of an offense other than forcible rape that could constitute the bodily injury in kidnapping with bodily injury. A natural candidate for such an offense was the aggravated sodomy mentioned in the jury instructions. This second review then revealed "ample support" for a finding of aggravated sodomy.

Although neither the Georgia Supreme Court's original opinion, nor its opinion on remand are models of analytic clarity, we need not settle definitively on one of the two outlined scenarios, as both would have rendered the proceedings in the state court "not inconsistent" with the Supreme Court's opinion in *Presnell v. Georgia* and, therefore, would have honored the Supreme Court's mandate.

■ We further point out that the United States Supreme Court has declined the invitation to bring the Georgia Supreme Court into line with its mandate in *Presnell v. Georgia.* In his certiorari petition from the Georgia Supreme Court's decision on remand, petitioner complained of the Georgia Supreme Court's alleged refusal to enforce the high court's mandate. The United States Supreme Court denied certiorari. While a denial of certiorari has no precedential value, and therefore may not be interpreted as endorsing the result in a case or the analysis employed to reach that result, it does reflect the Supreme Court's assessment of a state court's efforts to comply with the Supreme Court's instructions. In the past, the Supreme Court has not hesitated to grant certiorari in cases where it detected a lack of compliance with its order. *See, e.g., Yates v. Aiken,* 484 U.S. 211, 214, 108 S.Ct. 534, 536, 98 L.Ed.2d 546 (1988); *NAACP v. Alabama, ex rel.*

*Flowers,* 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964).

**B.**

■ On appeal,[5] petitioner argues that his trial counsel rendered ineffective assistance at the guilt phase [6] by failing to raise the insanity defense.[7]

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-prong test to use in evaluating claims of ineffective assistance of counsel:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

---

5. Petitioner did not raise on appeal four instances of ineffective assistance considered by the district court: his trial counsel's failure to challenge the composition of (1) the grand and (2) traverse juries, and his counsel's failure (3) properly to investigate the facts and circumstances surrounding the offenses charged, and (4) thoroughly to investigate possible defenses.

6. Petitioner also complains of ineffective assistance at the sentencing stage. We need not address this claim since the writ issues on other grounds. On appeal, he further alleges ineffective assistance of counsel in his first state habeas proceeding. The Supreme Court repeatedly has held that "[t]here is no constitutional right to an attorney in state postconviction proceedings." *Coleman v. Thompson,* — U.S. ——, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991) (citing *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989)). *Coleman,* however, did not decide whether "there must be an exception to the rule of *Finley* and *Giarratano* in those cases where state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.,* 111 S.Ct. at 2567. Nevertheless, even assuming that such an exception should be established, petitioner could not benefit from it. The language in *Coleman* refers to a case where a particular claim is cognizable only on state collateral review, but not on direct appeal. In *Coleman,* Virginia law held a claim of ineffective assistance cognizable only on state collateral review. *Id.* The specific question left open

in *Coleman* therefore was: can failure to present a claim of ineffective assistance of trial counsel on state collateral review—a claim cognizable only on state collateral review—itself constitute ineffective assistance of counsel? In contrast, petitioner argues that failure to raise a claim under *In re Winship* on state collateral review—clearly a claim cognizable on direct appeal—constitutes ineffective assistance of counsel. Since the underlying claim pursuant to *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), could have been raised on direct appeal, petitioner cannot escape the general rule established in *Finley* and *Giarratano,* even if the exception outlined in *Coleman* should be adopted.

7. Petitioner complains of three additional instances of ineffective assistance at the guilt phase: (1) his counsel's failure to preserve a burden of proof claim under *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and his counsel's failure to challenge (2) the instructions on intent and (3) the validity of petitioner's waiver of his *Miranda* rights. Petitioner did not allege these shortcomings in his federal habeas petition and did not amend his petition to include them. Accordingly, the district court did not consider these contentions in its decision, and we see no reason to do so now.

Petitioner also finds fault with his counsel's failure to present all mitigating evidence to the jury. As the writ issues with respect to petitioner's death sentence on other grounds, we need not, and do not, address this claim.

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. The Court further noted that "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066.

The district court found that petitioner had "failed to produce any evidence whatsoever to support any claim of insanity." The court further found that petitioner "has not come forward with any evidence that would tend to show that trial counsel's decision not to raise an insanity defense was not the result of reasonable professional judgment." We adopt the district court's findings of fact on this issue as not clearly erroneous and therefore reject petitioner's ineffective assistance claim.

### C.

█ Petitioner enlists *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), to bolster his claim that the trial court's order to compel a psychiatric examination of petitioner violated petitioner's privilege against self-incrimination under the Fifth and Fourteenth Amendments. *Smith,* however, is easily distinguishable.

In *Smith,* the Supreme Court held that the testimony of a court appointed psychiatrist at the penalty phase of a bifurcated capital trial violated the defendant's privilege against self-incrimination under the Fifth and Fourteenth Amendments and right to counsel under the Sixth and Fourteenth Amendments.[8] Unlike in *Smith,* the record in the present case establishes

that petitioner's counsel both received ample notice of the State's intention to seek a psychiatric examination and had ample opportunity to confer with petitioner to inform him of his right against self-incrimination. According to the district court's findings, prior to trial "[t]here had been indications" that petitioner might present a defense of insanity or diminished capacity. Following these indications, the State on May 10, 1976, more than one month before the examination and almost three months prior to trial, moved the trial court for an order directing a psychiatric examination of petitioner to determine his sanity. On May 18, 1976, the court held a first hearing on the State's motion. On June 8, 1976, still more than two weeks before the examination, during a second hearing on the motion, petitioner's counsel indicated in a colloquy with the court about counsel's ability to advise his client on his right to remain silent during the examination that he had "conferred sufficiently" with petitioner. Moreover, in response to a question by petitioner's counsel, the court explicitly affirmed the propriety of advising petitioner of his right to remain silent, remarking that this right "would supersede any right that the State would have." On June 17, 1976, the court granted the State's motion. Another six days later, on June 23, 1976, petitioner was transferred for eight days to Central State Hospital, Milledgeville.

Again in contrast to *Smith,* the trial court in the present case undertook several efforts to protect petitioner's right against self-incrimination. First, he explicitly approved of defense counsel's efforts to educate petitioner on his right to remain silent during the psychiatric examination. He further specified in his order directing petitioner to be examined by Milledgeville psychiatrists, that "[t]o provide for the securing of the rights of Defendant against self-incrimination, the said medical examiner shall not disclose, without prior order of this Court, the content of statements or conversations with said accused."

---

8. Petitioner does not allege a violation of his right to counsel under the Sixth and Fourteenth Amendments.

As yet another point of distinction between *Smith* and the present case, the psychiatrist in *Smith* extensively testified about remarks made to him by the defendant, including a detailed account of the crime, and identified defendant's account as "the most important thing that ... caused [him] to think that [defendant] is a severe sociopath...." *Smith*, 451 U.S. at 464 n. 9, 101 S.Ct. at 1874 n. 9. In the present case, the psychiatrist at no time referred to any statements made to him by petitioner. The psychiatrist merely testified that he had interviewed petitioner. Nothing in the record indicates that the psychiatrist in the present case "drew his conclusions largely from [petitioner's] account of the crime during [the examination]" or "rested [his diagnosis] on statements ... made, and remarks he omitted, in reciting the details of the crime." *Id.* at 464, 101 S.Ct. at 1873–74 (footnotes omitted). In contrast, the psychiatrist based his opinion that petitioner had no symptoms of insanity on his "experience as a psychiatrist [and his] examination of [petitioner]."

Finally, the Supreme Court's opinion in *Smith* rested in part on the fact that the prosecution had presented the psychiatrist's testimony even though the defendant had "introduced no psychiatric evidence, nor had he indicated that he might do so." *Id.* at 466, 101 S.Ct. at 1874. Instead, the prosecution introduced the testimony at the penalty phase of a capital trial in order to establish the defendant's future dangerousness, "a critical issue at the sentencing hearing, and one on which the State had the burden of proof beyond a reasonable doubt." *Id.* at 466, 101 S.Ct. at 1874–75 (citation omitted). In the present case, the State introduced the psychiatrist's testimony during the guilt phase of petitioner's trial, having requested an examination in response to indications that petitioner might pursue a defense of insanity or diminished capacity.

Considering that the Supreme Court carefully limited its holding to the "distinct circumstances" in *Smith, id.* at 466, 101 S.Ct. at 1875, the mentioned distinctions between *Smith* and the present case render *Smith* inapposite. We further conclude that these significant differences neutralize petitioner's claim that the trial judge's order directing a psychiatric examination of petitioner violated petitioner's Fifth Amendment right against self-incrimination.

### D.

 Next, petitioner argues that the trial court's denial of his motion for change of venue violated his rights under the Sixth and Fourteenth Amendments. The Georgia Supreme Court, on direct appeal, found that "the trial court did not abuse its discretion in finding that the jury selection process revealed no degree of actual prejudice." *Presnell v. State*, 241 Ga. 49, 243 S.E.2d 496, 502, *rev'd in part on other grounds*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978). Similarly, the district court found that petitioner had "presented no facts showing actual prejudice on the part of the jurors who were selected to try his case." While the Georgia Supreme Court did not address the question of whether petitioner had established facts sufficient to warrant the extraordinary finding of presumed, as opposed to actual, prejudice, the district court found that petitioner had failed to establish such facts. Although it is not settled whether actual and presumed prejudice represent pure questions of fact, or mixed questions of fact and law, *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986), findings regarding both questions clearly are entitled to a significant presumption of correctness. *Id.* Petitioner has given us no reason to disturb the findings of the Georgia Supreme Court and the district court.

### E.

 Petitioner further complains of the district court's failure to conduct an evidentiary hearing. In particular, petitioner contends that he was entitled to an evidentiary hearing on his claims that his counsel had rendered ineffective assistance and that he

was improperly denied a change of venue.[9] We find no fault with the district court's decision to dispose of these issues on the basis of the record of the state proceedings, the federal habeas petition, and the response.

### F.

■ Finally, petitioner contends that his grand jury and traverse juries were unconstitutionally composed because women and blacks were systematically excluded from the grand and traverse jury pools. Petitioner did not raise this claim until his state habeas proceedings. There, the state habeas court held that petitioner had procedurally defaulted the claim. The court also held that petitioner had failed to establish cause for his trial counsel's failure to object to, and prejudice resulting from, the composition of his grand and traverse juries. The district court considered the claim procedurally barred, and also found lack of both cause and prejudice. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). We agree with the district court.

### IV.

For the reasons stated above, we AFFIRM the judgment of the district court.

IT IS SO ORDERED.

---

9. Petitioner also claims that he was entitled to an evidentiary hearing on his claims that the death penalty in Georgia is arbitrarily administered, and that the death penalty in Georgia is discriminatorily administered. As mentioned above, we need not, and do not, address these challenges to petitioner's death sentence because the writ issues with respect to petitioner's death sentence on other grounds.