[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14322

_____

D.C. Docket No. 1:07-cv-1267-WBH

VIRGIL DELANO PRESNELL,

Petitioner-Appellant,

versus

WARDEN.

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 16, 2020)

Before ROSENBAUM, TJOFLAT, and ED CARNES Circuit Judges.

TJOFLAT, Circuit Judge:

Virgil Delano Presnell, Jr., appeals the District Court's decision denying his

petition for writ of habeas corpus vacating the death sentence he received for a

murder he committed in 1976.  In a bifurcated trial held that year, a jury found him

guilty of the murder in the guilt phase and returned a death-sentence verdict in the sentencing phase.  Subsequently, in a collateral proceeding brought in 1985, that verdict was vacated.  In 1999, a retrial of the sentencing phase was held.  The result was the same: a death sentence.

The issue in this appeal is whether the lawyers who represented Petitioner at the 1999 retrial deprived him of his constitutional right to the effective assistance of counsel in failing to attain and present mitigation evidence.  In seeking mitigating evidence, one of the lawyers' investigators interviewed Petitioner's mother, who reported that she "did not drink except socially" while pregnant with Petitioner.  In an affidavit submitted to the District Court in support of his habeas petition, though, his mother stated that she drank bourbon to excess throughout her pregnancy.  Also submitted were the reports of two psychologists diagnosing Petitioner with fetal alcohol spectrum disorder, a diagnosis reached in large part on the basis of his mother's affidavit.

I.

The circumstances that gave rise to this habeas petition in this case harken back to 1976.  On July 1 of that year, a grand jury indicted Petitioner, Virgil Delano Presnell, Jr., for four felonies he committed on May 4, 1976, after encountering two girls walking home from school, L.S., age eight, and A.F., age ten.  Two of the felonies, malice murder, a capital offense, and kidnapping,

involved L.S.  Two of the felonies, kidnapping with bodily injury and forcible

rape, both capital offenses, involved A.F.[1]  Petitioner stood trial in the Superior

Court of Cobb County in August 1976.  The jury found him guilty as charged at

the conclusion of the guilt phase and imposed a death sentence for each capital

offense in the penalty phase.  On direct appeal, the Georgia Supreme Court

described the jury's verdicts and the sentences imposed: "The jury imposed the

penalty of death for the murder of [L.S.], the kidnapping with bodily injury of

[A.F.], and the rape of [A.F.].  [Petitioner] was sentenced to twenty years in prison

for the kidnapping of [L.S.]."  *Presnell v. State* (*Presnell I*), 243 S.E.2d 496, 500

(Ga. 1978).

　　The procedural history that followed is long.  The Georgia Supreme Court

affirmed Petitioner's convictions and the death sentence imposed for the murder; it

vacated the death sentences for kidnapping with bodily injury and forcible rape.[2]

---

[1] The indictment also charged Petitioner with aggravated sodomy of A.F.  The charge
was dropped prior to Petitioner's trial.

[2] The U.S. Supreme Court recounted the Georgia Supreme Court's reasoning:

> [The first two death sentences] depended upon petitioner's having committed
> forcible rape, and the [Supreme Court of Georgia] determined that the jury had not
> properly convicted petitioner of that offense.
> 　　In addition, the Supreme Court of Georgia held that the State could not rely upon
> sodomy as constituting the bodily injury associated with the kidnaping.
> Nonetheless, despite the fact that the jury had been instructed that the death penalty
> for murder depended upon a finding that it was committed while petitioner was
> engaged in "kidnapping with bodily harm, *aggravated sodomy*" (emphasis added),
> the Georgia Supreme Court upheld the third death penalty imposed by the jury.  It
> did so on the theory that, despite the lack of a jury finding of forcible rape, evidence
> in the record supported the conclusion that petitioner was guilty of that offense,

*Id.* at 500, 508. The United States Supreme Court, on certiorari review, reversed the conviction for kidnapping with bodily injury and the death sentence for the murder and remanded the case for further proceedings.[3] *Presnell v. Georgia*, 439 U.S. 14, 99 S. Ct. 235 (1978). On remand, the Georgia Supreme Court reinstated the death sentence for the murder and the conviction for kidnapping with bodily injury.[4] *Presnell v. State* (*Presnell II*), 252 S.E.2d 625, 626–27 (Ga. 1979). In addition, it reduced the forcible rape conviction to a conviction for statutory rape. *Id.*

The Georgia Supreme Court's decision in *Presnell II* brought an end to the appellate review of Petitioner's 1976 trial. Petitioner filed successive habeas corpus petitions in state and federal courts over the next twelve years. He sought to vacate his convictions and death sentence, contending that he had been convicted and sentenced to death in violation of the United States Constitution.[5]

---

which in turn established the element of bodily harm necessary to make the kidnapping a sufficiently aggravating circumstance to justify the death sentence.

*Presnell v. Georgia*, 439 U.S. 14, 15–16, 99 S. Ct. 235, 236 (1978).

[3] The U.S. Supreme Court held that in the absence of a jury finding of forcible rape, a death sentence could not be upheld on the basis that evidence in the record supported a conclusion that Petitioner was guilty of forcible rape, which in turn established the element of bodily harm necessary to make kidnaping an aggravating circumstance. *Presnell v. Georgia*, 439 U.S. 14, 99 S. Ct. 235 (1978).

[4] The Court concluded that the death sentence was supported by the jury's "finding of kidnapping with bodily injury, aggravated sodomy of [A.F.]" and that aggravated sodomy "suppl[ied] the element of bodily injury required for the kidnapping [with bodily injury] offense." *Presnell II*, 252 S.E.2d at 627.

[5] Petitioner filed his first petition for habeas corpus on January 8, 1980. Petitioner petitioned the Superior Court of Butts County, Georgia, for a writ of habeas corpus. His

Petitioner prevailed in part when the United States District Court for the Northern

District of Georgia issued a writ of habeas corpus vacating Petitioner's death

sentence, which we affirmed.[6] *Presnell v. Zant* (*Presnell III*), 959 F.2d 1524 (11th

Cir. 1992). The Court issued the writ because the prosecutor's argument to the

---

amended petition contained twelve counts, numbered fifteen through twenty-six. Counts fifteen through seventeen challenged the validity of grand and traverse Cobb County juries that indicted and convicted him. Count eighteen alleged that his trial attorney was constitutionally ineffective in failing to timely challenge the validity of the respective juries. Counts nineteen through twenty-three challenged the selection and composition of Cobb County juries. Counts twenty-four and twenty-five alleged that Petitioner was tried while mentally incompetent. Count twenty-six alleged that Petitioner's attorneys provided ineffective assistance of counsel in failing to develop and present mitigating evidence at the penalty phase of his trial. On January 23, 1980, the Superior Court, following an evidentiary hearing, denied his petition; on March 19, 1980, the Georgia Supreme Court denied his application for a certificate of probable cause to appeal; and on October 6, 1980, the U.S. Supreme Court denied certiorari review. *Presnell v. Zant*, 449 U.S. 891, 101 S. Ct. 245 (1980).

On June 15, 1981, Petitioner petitioned the U.S. District Court for the Northern District of Georgia for habeas relief pursuant to 28 U.S.C. § 2254. The Court dismissed his petition on January 13, 1984, because he failed to exhaust his state remedies. So, he returned to the Superior Court of Butts County on January 26, 1984, filing a second habeas petition. On October 6, 1984, the Court denied the petition as successive, and the Georgia Supreme Court denied his application for a certificate of probable cause to appeal on November 16, 1984. *See Presnell v. Kemp*, 835 F.2d 1567 (11th Cir. 1988).

[6] On May 15, 1985, Petitioner filed a second petition for habeas corpus relief in the U.S. District Court for the Northern District of Georgia. The Court granted the petition in part, vacating Petitioner's death sentence on the ground that the trial court, in the penalty phase of his trial, gave the jury an improper burden shifting instruction. The State appealed, and this Court reversed the District Court's decision and remanded the case for further proceedings. *Presnell v. Kemp*, 835 F.2d 1567, *reh'g en banc denied*, 854 F.2d 1326 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882 (1989). On remand, the District Court, on July 11, 1990, vacated Petitioner's death sentence again, which we explain in the accompanying text. *See Presnell v. Kemp*, 835 F.2d 1567 (11th Cir. 1988); *see also Presnell v. Hall*, No. 1:07-CV-1267-CC, 2013 WL 1213132 (N.D. Ga. Mar. 25, 2013).

5

jury at the close of the penalty phase of his trial was so egregious that it rendered the proceeding fundamentally unfair and thus a denial of due process of law.[7]

The District Court issued the writ of habeas corpus without prejudice to the State's right to retry the penalty phase of Petitioner's trial. The State waited until late 1997 to notify Petitioner that it had elected to retry the penalty phase. Shortly thereafter, the Superior Court of Cobb County reopened Petitioner's case. Since Petitioner was indigent, the Superior Court, in the first week of January 1998, appointed two attorneys to represent him, Stephen Schuster and Mitch Durham (we refer to Schuster and Durham collectively as Defense Counsel). Attorney Dianna McDaniel also represented Petitioner. Defense Counsel hired McDaniel with

---

[7] In its closing argument during the sentencing phase of Petitioner's trial, the prosecutor quoted from *Eberhart v. Georgia*, 47 Ga. 598 (1873). The prosecutor said:

> We have, however, no sympathy with that sickly sentimentality that springs into action whenever a criminal is at length about to suffer for crime. It may be a sign of a tender heart, but it is also a sign of one not under proper regulation. Society demands that crime shall be punished and criminals warned, and the false humanity that starts and shudders when the axe of justice is ready to strike, is a dangerous element for the peace of society. We have had too much of this mercy. It is not true mercy. It only looks to the criminal, but we must insist upon mercy to society, upon mercy [sic] to the poor woman whose blood cries out against her murderers. That criminals go unpunished is a disgrace to our civilization, and we have reaped the fruits of it in the frequency in which bloody deed [sic] occur. A stern, unbending, unflinching administration of the penal laws, without regard to position or sex, as it is the highest mark of our [sic] civilization, it [sic] is also the surest mode to prevent the commission of offenses.

*Presnell III*, 959 F.2d at 1528.

funds provided by the Cobb County Circuit Defender's Office pursuant to an order

the Superior Court entered on September 11, 1998.

The penalty-phase retrial began on February 22, 1999, before a newly

summoned jury. On March 16, the jury returned a death-sentence verdict, and the

Superior Court sentenced Petitioner accordingly. On appeal, the Georgia Supreme

Court affirmed Petitioner's sentence. *Presnell v. State*, 551 S.E.2d 723 (Ga. 2001),

*cert. denied, Presnell v. Georgia*, 535 U.S. 1059, 101 S. Ct. 1921 (2002).

On October 16, 2002, Petitioner petitioned the Superior Court of Butts

County for a writ of habeas corpus. His petition presented forty-three claims for

relief, each asserting a violation of a state or federal constitutional right. Some of

the claims sought the vacatur of his convictions. Others sought the vacatur of his

death sentence on the theory that Defense Counsel denied Petitioner his Sixth

Amendment right to the effective assistance of counsel, as explicated in

*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984),[8] in preparing for

and presenting Petitioner's defense at the retrial of the penalty phase. One of the

ways in which Defense Counsel were allegedly derelict is that they failed to

discover that Petitioner suffered from Fetal Alcohol Spectrum Disorder ("FASD")

---

[8] The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Amendment has been made applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Parker v. Gladden*, 385 U.S. 363, 364, 87 S. Ct. 468, 470 (1966).

7

which accounted for his behavior on May 4, 1976 (the "FASD" claim).  On December 27, 2005, following an evidentiary hearing, the Superior Court denied the petition.  And on November 6, 2006, the Georgia Supreme Court denied Petitioner's application for a certificate of probable cause to appeal the Superior Court's judgment.

Having exhausted his state court remedies, Petitioner, on June 1, 2007, turned once more to the Northern District of Georgia for habeas corpus relief.  His § 2254 petition presented forty claims; he attacked both his convictions and death sentence on multiple constitutional grounds.  Petitioner presented several ineffective assistance claims, including the FASD claim, which the Superior Court of Butts County had denied.  Petitioner argued that the Superior Court, in denying the claims, misapplied *Strickland v. Washington*.  The District Court was not persuaded.  It denied all of Petitioner's claims, including the ineffective assistance claims.  Petitioner applied to the District Court for a certificate of appealability ("COA") so he could appeal its decision.  *See* 28 U.S.C. § 2253(c).  The Court granted his application but limited it to one issue: whether Defense Counsel were constitutionally ineffective in failing to discover that Petitioner suffered from FASD.

8

II.

A.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits the circumstances in which a federal court may grant a writ of habeas corpus setting aside a state court judgment adjudicating a claim alleging the denial of a constitutional right:

> Under AEDPA, a federal court may not grant a habeas corpus application with respect to any claim that was adjudicated on the merits in State court proceedings, 28 U.S.C. § 2254(d), unless the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, § 2254(d)(1).

*Johnson v. Upton*, 615 F.3d 1318, 1329 (11th Cir. 2010) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 380, 130 S. Ct. 2250, 2259 (2010)) (quotation marks omitted).

In this appeal, we ask whether the District Court erred in deciding that the Superior Court of Butts County's decision was not (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined" in *Strickland v. Washington*, *see* 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the

9

state court proceeding," 28 U.S.C. § 2254(d)(2).[9]  That is, we determine *de novo* whether the District Court erred in rendering either decision.

In answering these questions, we keep two principles in mind.  First, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of [the state court's] decision."  *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)).  Second, the state court's findings of fact are "presumed" to be correct.  28 U.S.C. § 2254(e)(1).  Thus, if a petitioner challenges a state adjudication that rests on findings of fact, he must overcome two hurdles.  He must rebut the presumption of correctness that attaches to the findings of fact, and he must do so with "clear and convincing evidence."  *Id.*  And he must overcome the deference that we give to the state court's adjudication under § 2254(d).

To prevail under *Strickland v. Washington*, a petitioner must show (1) that his trial "counsel's performance was deficient" and (2) that it "prejudiced [his] defense."  466 U.S. at 687, 104 S. Ct. at 2064.  He satisfies the second element only on showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A

---

[9] These are the same questions the District Court answered in deciding whether the Superior Court's decision was deficient under 28 U.S.C. § 2254(d)(1) or (2).

10

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.*, 131 S. Ct. at 787–88 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

## B.

The District Court ruled on the same record on which the Superior Court of Butts County denied Petitioner's application for a writ of habeas corpus on December 27, 2005. The record includes a transcript of Petitioner's trial in August 1976; the record before the Georgia Supreme Court in Petitioner's appeal of his convictions and death sentences, and that Court's opinion affirming them; material parts of the proceedings the Superior Court of Butts County held on the habeas petition Petitioner filed on January 8, 1980;[10] the transcript of Petitioner's trial in February and March of 1999, the record before the Georgia Supreme Court in Petitioner's appeal of his death sentence, and that Court's opinion affirming the sentence; and the evidence the Superior Court received in the habeas proceedings in reaching its December 27, 2005 decision—specifically, the evidence bearing on

---

[10] *See* note 5, *supra*.

11

Defense Counsel's preparation for and presentation of Petitioner's defense at the penalty phase retrial, which, according to Petitioner, constituted deficient performance under *Strickland*.[11]

In part III.A below, we visit Petitioner's 1976 trial. We recite the facts on which the jury found Petitioner guilty as charged, the aggravating circumstances the State presented in seeking death sentence verdicts, and the testimony Petitioner's counsel presented in urging the jury to return life-sentence verdicts. The 1976 trial informed Defense Counsel of what the State would present at the penalty phase retrial and the task they faced in presenting a defense that would mitigate the State's case for a death sentence. In subsection B, we introduce Defense Counsel and the team they assembled, set out the investigatory steps they took in preparing for the retrial, and recount what their investigation revealed. Subsection C recounts what took place at the retrial.

Part IV focuses in subsection A on the litigation of Petitioner's ineffective assistance of counsel claim in the Superior Court of Butts County, specifically, the FASD claim; in subsection B on the District Court's decision under AEDPA not to

---

[11] The record in this appeal does not include the records of the habeas petition Petitioner filed in the Northern District of Georgia on June 15, 1981; the habeas proceedings brought in the Superior Court of Butts County on January 26, 1984; or the proceedings held in *Presnell III*. *See* notes 5 & 6, *supra*.

12

disturb the Superior Court's denial of that claim; and in subsection C on our

conclusion that the District Court did not err.

III.

A.

1.

The Georgia Supreme Court, in its *Presnell I* opinion affirming the

convictions and death sentences resulting from the 1976 jury trial, provided

Defense Counsel with the facts the State would present in support of its quest for a

death sentence. Here are the facts the State would present[12]:

> The defendant was seen the day before the crimes by a lady who was picking up her children from school. He was returning to his blue car which was parked a short distance away from the school. At [his] trial [on the July 1, 1976 indictment,] the defendant took the stand and explained that he had walked to the wooded area across from the school where he watched the little girls through binoculars while he played with himself. He testified that he had frequently visited adult bookstores and movies, and that he was reading a book entitled "He Warmed Her Young Body." He returned the next day . . . and saw two little girls walk from the school down a road beside the woods. The defendant was again seen by the same lady who had observed him the day before. The defendant testified that he had driven to the wooded area near the school where he again watched the little girls. He had brought a sleeping bag, a rug, a jar of lubricant and rope. He waited for the two children, one of whom he said reminded him of the girl in his book. The girls entered the wooded area on a path which led to their homes on the other side, a distance of less than five hundred yards. The older child was ten years old, the younger child was eight. The defendant grabbed them from behind, covered their mouths with his hand and told them he would use the gun in his pocket if they did not

---

[12] At the 1976 trial, George W. Darden, III, District Attorney for Cobb County, Georgia, represented the State. J. Milton Grubbs, Jr., William P. Holley, and Adele Platt, court-appointed attorneys, represented Petitioner.

do as told.   He tied them but then untied them and took them to his car and drove away with them.

The mother of the younger child became concerned and drove to the school.  Finding the lights out in her daughter's schoolroom, she walked the path through the wooded area.  On the trail she found school books in which the older child's name had been written.  She contacted the school principal, her husband, and the police.  With neighbors and other volunteers the parents of the two children continued searching for them.

After stopping for gasoline at a self-service station, the defendant drove to an unpopulated wooded area.  He testified that on the way and while he was driving, he had the older child place his sex organ in her mouth.  At the secluded area, he took a blue rug and jar of lubricant from the car trunk and went into the wooded area with the children.  He had the children remove their clothing and caused the older child to lie on the rug.  He testified that he then removed his clothes and penetrated the older child.  When he stopped she was bleeding.  Her vagina was torn and required surgery for repair.  He let the children dress.  The older child was slower, so he took the younger child back toward the car first.

Along the way the younger child ran away from the trail.  He chased her across a narrow, shallow creek.  In his taped confession he said, "Well, when we got down to the creek, I don't really know why, but I just pushed her down into the creek and held her there.  Well, she was kicking and trying to get out but I just held her there until she stopped kicking.  Well, I figured she was dead and for some reason I didn't want to leave her in the creek and that is the reason I carried her out of the creek and layed her down."  At trial the defendant testified that he accidentally fell on top of the fallen younger child who was still gasping for air as he pulled her to the creek bank and departed.  The autopsy indicated that the cause of her death was drowning.

The defendant returned to the older child and took her towards a nearby section of the creek where he again had her place his sex organ in her mouth.  Next, the defendant put the older child in the trunk of his car.

After driving some distance, a tire on the defendant's car lost air pressure.  He left the older child in another wooded area near a service station and drove to his mother's nearby residence to repair the tire.  The child found help at the service station.  She told police that the man

14

was driving a blue car and had had tire trouble. The defendant was found by police installing a tire on his car.

During the course of his testimony at trial the defendant admitted acts showing commission of each of the crimes (except the murder) for which he was convicted. (In his confession to police he admitted facts showing murder.) He testified that because the children did not protest, he did not believe at the time of the crimes that his acts were wrong. The court's expert witness, who had supervised a court-ordered psychiatric examination of the defendant, testified that he had no reason to believe that the defendant did not know right from wrong.

*Presnell I*, 243 S.E.2d at 500–01.

As indicated in the passages quoted above, Petitioner testified in his defense during the guilt phase of his trial. Petitioner was the only witness counsel put on in his defense. The jury had already heard his confession; his testimony gave him an opportunity to explain it. His testimony supported the two-fold theory of his defense: (1) the drowning of L.S. was an accident, and (2) he did not understand that kidnapping and rape were wrong.

Petitioner explained that he had been acquiring pornographic books involving adult men and children for a long time. What he read and saw—in particular, depictions of men having sexual intercourse with young girls—gave him the urge to seek out young girls, according to Petitioner. Counsel's theory was that his consumption of pornographic media explained why he kidnapped the two girls, so counsel had him tell the jury about it. Counsel then asked Petitioner to describe what took place on May 4, 1976, and the day before.

15

Petitioner's response was consistent with what the State's evidence had portrayed. On May 3, the day before he abducted L.S. and A.F, he hid in the bushes across from their school[13] and, while "play[ing] with himself," watched with binoculars the children leaving school. He seized L.S. and A.F. the next day as they were walking through the woods. He said he did it because A.F. reminded him of a girl in one of his pornographic books. He did not think it would hurt her. When he realized that she was bleeding he stopped and asked A.F. and L.S., who he also had forced to undress, to put their clothes back on. While A.F. was dressing, L.S. ran away, and he gave chase. They came upon a creek, and she fell in. He stumbled and fell on top of her. He got up and pulled her out of the creek. She was gasping for air, so he compressed her chest and departed to look for A.F. He found her, put her in the trunk of his car, and drove to his mother's apartment to change out of his wet clothes. He left L.S. behind, assuming that she was alright and could leave the woods on her own. He did not intend to kill her.

On cross-examination, Petitioner acknowledged that his explanation of L.S.'s death conflicted with what he stated in his May 4 confession—that he pushed her down in the creek and held her there until she stopped moving. He

---

[13] The Richard B. Russell Elementary School in the City of Smyrna in Cobb County, Georgia.

16

explained the statement by saying that, at the time of his confession, he "really didn't care what happened to [him]."

On redirect examination, Petitioner said that he was unaware of the crime of kidnapping when he seized the two girls on May 4. He didn't know it was wrong to kidnap the two young girls because they were willing to go along with everything he told them to do—he didn't force anything.

In the end, the defense strategy did not persuade the jury, and it found Petitioner guilty as charged. After receiving the jury's verdicts, the Court convened the penalty phase.

2.

In the penalty phase of Petitioner's trial, the State contended that the following aggravating circumstances warranted the jury's imposition of three death sentences. Petitioner should be sentenced to death because (1) he murdered L.S. while engaged in the commission of kidnapping with bodily injury of A.F.; (2) he kidnapped with bodily injury A.F. while committing the rape of A.F.; and (3) he raped A.F. while committing the murder of L.S.[14] The State based its case for the imposition of these sentences on the evidence adduced in the guilt phase and the jury's verdicts.

---

[14] *Presnell I*, 243 S.E.2d at 500.

3.

Petitioner's case for the imposition of concurrent life sentences consisted of the testimony of four witnesses: Harry Porter, M.D., a psychiatrist; Miguel A. Bosh, M.D., a psychiatrist; Rev. John T. Welch, a Baptist minister; and Lois Cole,[15] Petitioner's mother. Dr. Porter and Dr. Bosh had examined Petitioner following his indictment. Both made the same mental health diagnosis—pedophilia, a mental disorder—and testified that the disorder was curable. Dr. Porter added that he did not believe that Petitioner intended to harm his victims and characterized him as a very compliant individual who could function satisfactorily in a controlled environment. Reverend Welch, the pastor of Glenn Haven Baptist Church, had supervised Petitioner for a year at a mission for juvenile delinquents.[16] He testified that he had baptized Petitioner and described him as "easily swayed."

Lois spoke of her son's troubled childhood.[17] Lois married Petitioner's father, Virgil Delano Presnell ("Delano"), in March of 1953. She was seventeen at the time. She gave birth to Petitioner on December 29 of that year. She said that Petitioner was raised without the benefit of fatherly guidance for most of his youth,

---

[15] In 1976, Petitioner's mother was named Lois Cole. In 1990, she married Willie Samples and became Lois Samples. For ease on the reader, we refer to her as Lois throughout this opinion.

[16] *See* note 29, *infra*.

[17] Lois was present in the courtroom throughout the trial.

18

and he had academic problems that caused him to fail "two or three different grades."

When Petitioner was about six months old, Lois, Delano and Petitioner moved to Pontiac, Michigan. A few months later, Lois and Petitioner returned to Atlanta and moved in with Lois' parents.[18] Shortly thereafter, she and Delano separated. Several years would pass before she saw him again. In the interim, she and Petitioner stayed with her parents. Lois got a job with the Mead Packaging Company, where she was still employed in 1976. When Petitioner was thirteen, Delano returned to Atlanta to live with Lois and Petitioner. But the arrangement did not last. In a year, they were divorced. She concluded her testimony by asking the jury to spare her son's life.

The parties' closing arguments focused on the issue of mercy. The District Attorney argued that Petitioner's troubled childhood was irrelevant. Defense counsel disagreed and pleaded for mercy throughout the argument.[19] Counsel's pleas for mercy failed to convince the jury. Finding that the State had established the aggravating circumstances required for the imposition of death sentences for

---

[18] Lois's parents were Harry Cleo Edwards and Eula Louise Rebecca Rumph. Lois had six siblings. Mildred was the oldest. After Mildred came Lois, and after Lois came Sarah, James, Patricia (called Peggy), Lillian, and Brenda. Lois's siblings are referred to by their first names throughout this opinion.

[19] Counsel also alluded to the testimonies of Dr. Porter and Dr. Bosh, both of whom opined that Petitioner's pedophilia was curable.

19

the capital crimes Petitioner had committed, the jury rendered the verdicts the State sought.

B.[20]

On January 7, 1998, after Petitioner's death sentence had been set aside in *Presnell III* and the State opted to retry the penalty phase of his case, the Superior Court of Cobb County appointed Stephen Schuster to represent Petitioner. Schuster, who served as lead counsel, was admitted to the Georgia Bar in 1976. Following Schuster's admission to the bar, he worked as an assistant solicitor in Cobb County for two years then moved to the Cobb County District Attorney's Office where he worked for two years as an assistant district attorney. After that, he entered private practice, specializing in the representation of individuals charged with criminal offenses. Before undertaking Petitioner's representation, Schuster had defended an accused in at least four cases in which the State sought a death sentence.

At Schuster's request, the Superior Court, on January 9, 1998, appointed Mitch Durham to assist him as co-counsel. Durham was admitted to the Georgia Bar in 1986. He began his legal career as a law clerk for the Superior Court of

---

[20] The facts recited in this subpart are taken from the findings of fact made expressly or impliedly by the Superior Court of Butts County in its December 27, 2005 order denying the application for a writ of habeas corpus Petitioner filed on October 16, 2002. These findings of fact are "presumed to be correct." 28 U.S.C. § 2254(e)(1).

20

Cobb County. After his clerkship, Durham practiced with a criminal defense attorney for eight years and then entered private practice as a criminal defense attorney. Prior to his appointment in Petitioner's case, he had defended an accused in six murder trials in which the State sought a death sentence.

Defense Counsel obtained a wealth of information about Petitioner before they started preparing for the retrial. They obtained the transcripts of the guilt and penalty phases of Petitioner's 1976 trial and the files maintained by the lawyers who participated in that trial: J. Milton Grubbs, Jr., the lead defense counsel, and George W. Darden, III, the prosecutor.[21] Defense Counsel had the records of the habeas corpus proceedings held in the Superior Court of Butts County on the petition Petitioner filed in 1980. These records included the mental health evaluation of Petitioner made by Joel Norris, Ph.D., a psychologist, who testified in those proceedings. In addition, Defense Counsel conferred with attorneys John L. Taylor, Jr., and Millie Dunn, who obtained the vacation of Petitioner's death sentence in the federal habeas proceeding held in *Presnell III*. And from the time they were appointed until the retrial, Defense Counsel conferred with Petitioner at least ten times, in person at the Jackson County Correctional Institution, by phone, and in writing.

---

[21] *See* note 12, *supra*.

21

After Defense Counsel digested the information these sources provided, the Superior Court, on September 11, 1998, granted their motion for funds to employ Andrew Pennington, an investigator with death-penalty experience;[22] Toni Bovee, a mitigation specialist;[23] Robert D. Shaffer, Ph.D., a neuropsychologist; Patricia L. Maykuth, Ph.D., a jury composition expert;[24] Harry Porter, M.D., the psychiatrist who evaluated Petitioner following his indictment and testified in the penalty phase of his 1976 trial;[25] and Dianna McDaniel, an attorney.[26] We refer to Defense Counsel and these individuals collectively as the Defense Team.

Once assembled, the Defense Team set about the task of finding mitigating evidence. They obtained photographs depicting Petitioner's childhood; his school records;[27] his medical records, including those at Central State Hospital;[28] and the

---

[22] Pennington had been recommended by Pam Leonard, a mitigation specialist with the Multi-County Public Defender's Office. He had conducted investigations in numerous capital cases in Georgia and California.

[23] Bovee was recommended by the Multi-County Public Defender's Office. She was a licensed private investigator in California and South Carolina, had over sixteen years of experience investigating mitigating evidence for defendants in capital cases, had worked in over 100 capital cases, and had attended thirty seminars focused on death-penalty mitigation.

[24] Maykuth had been a consultant in over seventy civil and criminal trials on issues including jury selection, jury profiling, perception, and memory.

[25] The Multi-County Public Defender's Office provided the funds needed to employ these experts along with Attorney Dianna McDaniel.

[26] Defense Counsel were assisted in the preparation of Petitioner's defense by the Multi-County Public Defender's Office, which provided them with an index to motions in capital cases and the names of experts in jury challenges and victim impact statements. Defense Counsel were also assisted by the Georgia Resource Center.

[27] The school records revealed, among other things, that Petitioner was a frequent truant indifferent to academic work and his statements that his parents thought he was "stupid" and "no good."

[28] Petitioner was at Central State Hospital from June 23, 1976 to July 1, 1976. He was sent to the hospital under Superior Court order for the purpose of psychiatric examination and

22

records pertaining to his incarceration in jails and prisons following his arrest on

May 4, 1976. The Defense Team also delved into his criminal history and found

that he had been imprisoned for multiple convictions for vehicular theft.[29]

Defense Counsel and other members of the Defense Team conducted several

interviews. Pennington interviewed Petitioner; his former wife, Debra Gilliland;[30]

his son, Brian Terry; his aunt, Peggy McQurter; his cousin, Marie Wilerson; and

---

evaluation. The hospital records, which were maintained during his incarceration, indicated that Petitioner was of average intelligence, that the results of an electroencephalogram (EEG) were normal, and that he had undergone a full psychological evaluation and was diagnosed with an antisocial personality disorder and sexual deviation but was found to be functioning within the normal range. The records also revealed that Petitioner showed no signs of guilt regarding his assaults on L.S. and A.F. and that he admitted to intentionally drowning L.S. in the creek.

[29] Petitioner was convicted in the Superior Court of Fulton County, Georgia, on November 1, 1971, for a vehicular theft that occurred on June 20, 1971, and in the Superior Court of DeKalb County, Georgia, on July 16, 1973, on four counts for vehicular thefts that occurred on January 28 and March 14 (two thefts) and 27, 1973. For his November 1, 1971 conviction, he was sentenced to prison for five years. The sentence was suspended and he was placed on probation after spending a year at the Georgia Christian Rehabilitation Center in March 1972. For his July 16, 1973 convictions, he was sentenced to prison for three years. He was released on parole on July 25, 1974. Defense Counsel also learned that Petitioner had been incarcerated for breaking into a school and convicted for aiding in the delinquency of a minor—a charge of sexual battery had been reduced to that offense.

In addition to these convictions, Defense Counsel were aware of Petitioner's assaults on young girls. Defense Counsel obtained the transcription of an interview conducted by Detective Williams and Lieutenant Moss on May 6, 1976. In the interview Petitioner admitted that, as early as age fourteen, he had grabbed young girls and reached under their dresses. Two months before the assault on L.S. and A.F., he followed a young girl from school, seized her, took her to a secluded spot, had her undress, and inserted his penis between her legs and simulated sex, but did not penetrate her. A few days after that incident, he seized a young girl, took her to a secluded spot, but ran off when it appeared that she was going to scream. Two weeks or so before he assaulted L.S. and A.F., Petitioner followed a young girl, took her off her bike, forced her to a wooded area and inserted his penis between her legs and simulated sex, again without penetrating her.

[30] Gilliland said that Petitioner had never tried to molest her or any family member and that their divorce was his suggestion.

23

one of his former victims, A.H.  Bovee interviewed Petitioner;[31] Lois; and two of

his aunts, Lillian Shepard and Peggy McQurter.[32]  Lois provided Bovee with a

family history.  Among other things, she told Bovee that Petitioner never had a

positive male role model and was more comfortable with children.  In discussing

her pregnancy with Petitioner, she said that she smoked a pack of cigarettes a day

and "did not drink except socially."  After receiving Pennington's and Bovee's

reports of these interviews, Schuster and/or Durham conferred with Lois, Gilliland,

Terry and Lillian.

Dr. Shaffer compiled Petitioner's life history with the information provided

by the Defense Team and his interviews with Petitioner, Lois and Lillian.[33]  Dr.

Shaffer's history reflected the following: Petitioner's father, Delano, came from a

---

[31] In her interview with Petitioner, Bovee learned of his educational background, family life, criminal involvement, marriage, and employment history.  He said that his uncle, James Edwards, was the prominent male figure in his life and that his father punched him in the face, beat him in the chest, and called him a sissy because he liked art and had no interest in sports.

[32] Like Lois, Lillian provided Bovee with Petitioner's life history, which included that Petitioner once lived in a house where five women slept in the same room; Petitioner slept with his mother until he was almost ten.  Petitioner's aunt, Peggy McQurter, confirmed what Bovee heard from Lois and Lillian about the family living in close quarters.

[33] Dr. Shaffer spent fifteen to twenty hours interviewing Petitioner and submitting him to psychological and intelligence testing.  His diagnosis was that Petitioner had a pedophilic disorder and minimal brain dysfunction.

Dr. Porter also diagnosed Petitioner with pedophilia.  Petitioner told Dr. Porter that he went to a car race two days before he assaulted L.S. and A.F. and "got worked up seeing all the good looking girls there"; that he went to their school the day before the assaults to watch the girls with binoculars; and that he returned the following day, kidnapped L.S. and A.F. and committed the crimes of which he had been convicted.  He realized what he had done was wrong and would be punished if caught.  He "did not know why [he] held [L.S.] down in the water until [he] thought she had quit breathing."

Dr. Joel Norris agreed with Dr. Shaffer's and Dr. Porter's pedophilia diagnoses.

family of alcoholics.  He was unfaithful to Petitioner's mother and, when he was around, he physically abused her and Petitioner.  For most of his childhood, Petitioner lived with several adult women, where sexual boundaries were ambiguous and privacy was scarce.  His mother's primary role was to make money rather than to raise Petitioner; Petitioner's grandmother and Aunt Lillian did the child rearing.  He had no male role models.

The Defense Team's investigation did not reveal that Petitioner suffered from FASD.  Thus, the disorder did not play a role in Defense Counsel's trial strategy.  The strategy they chose was to create a lingering doubt in the jurors' minds as to whether L.S.'s killing was accidental, or was deliberate as the State contended, and to prompt the jurors to return a life-sentence verdict.  As a fallback position, they urged the jury to return a life-sentence verdict as a matter of mercy.[34]

## C.

The penalty-phase retrial took place from February 22 to March 16, 1999. District Attorney Patrick Head and Assistant District Attorneys Russell Parker and

---

[34] Mercy was the focus of the sentencing phase of Petitioner's 1976 trial.  *Presnell III*, 959 F.2d at 1530.  Indeed, the parties' "closing arguments . . . revolve[d] around the mercy issue."  *Id.*  We vacated Petitioner's death sentence because the State, drawing on comments a Justice of the Georgia Supreme Court made in *Eberhart v. State*, 47 Ga. 598 (1873)—comments this Court has condemned on several occasions—told the jury that it "must exclude any consideration of mercy from its sentencing decision [and] therefore in effect deprived petitioner of his only remaining plea for life," *Presnell III*, 959 F.2d at 1530, and denied him due process of law.  *Presnell III* thus informed Defense Counsel that appealing to the jury's sense of mercy was a viable sentencing strategy.

25

Jack Mallard represented the State.  Defense Counsel, assisted by Dianna McDaniel, represented Petitioner.  The State called sixteen witnesses in its case in chief and three on rebuttal.  Petitioner called six witnesses, including Lois.

1.

Parker made the State's opening statement to the jury.  He began by explaining what happened on May 4, 1976.  He described how A.F. was able to escape and help the police find Petitioner, who subsequently confessed and led the police to L.S.'s body.  After that, he previewed the testimony of the Medical Examiner, Dr. Joseph Burton.  Dr. Burton would say that L.S. drowned; that she had water and sand in her stomach; that her bronchial tubes leading to her lungs had plant matter in them; that she had superficial abrasions in her eyelid, the tip of her nose, lower lip, and chin; that she had marks around her throat, inner left forearm, and right forearm; and that she had bruising over her back.

Parker concluded by saying that the jury should return a death-sentence verdict because the evidence on which Petitioner's conviction for the murder of

26

L.S. was based established the following aggravating circumstances: (1) kidnapping with bodily injury,[35] (2) torture,[36] and (3) depravity of the mind.[37]

Schuster delivered the opening statement for Petitioner. He began by telling the jury that, after assaulting A.F. and L.S., Petitioner made no attempt to flee. He let A.F. go, knowing that she would be able to identify him and his car. Then, following his arrest, he told the police what he had done and helped them find L.S.'s body. Schuster focused on Petitioner's upbringing. His parents separated when he was a year old, and his mother moved in with her parents—Petitioner's grandparents—and her six siblings (five sisters and a brother). The family was dependent on welfare, living in housing projects and in cramped quarters. Sexual abuse was rampant, perpetrated by Petitioner's maternal uncle, James. When Petitioner was thirteen, his father returned and moved in with him and his mother. His father drank to excess and was physically abusive. He beat and belittled

---

[35] O.C.G.A. § 17-10-30(b)(2). This subsection authorizes a jury to return a death-sentence verdict if the murder at issue was committed "while the offender was engaged in the commission of another capital felony," such as the offense of kidnapping with bodily injury. Although a death sentence could no longer be imposed for the offense of kidnapping with bodily injury, the Georgia Supreme Court classifies it as a capital offense when introduced as an aggravating circumstance for murder. *Cook v. State*, 251 S.E.2d 230, 230 (Ga. 1978).

[36] O.C.G.A. § 17-10-30(b)(7). This subsection authorizes a jury to return a death-sentence verdict if the murder at issue was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Id.* The Georgia Supreme Court construes this subsection as disjunctive, creating three aggravating circumstances: an outrageously or wantonly vile, horrible, or inhuman murder that involved (1) torture, (2) depravity of the mind, or (3) an aggravated battery. *Ellington v. State*, 735 S.E.2d 736, 146 (Ga. 2012) (citing *Hance v. State*, 268 S.E.2d 339, 345 (Ga. 1980)).

[37] O.C.G.A. § 17-10-30(b)(7); *see* note 36, *supra*.

27

Petitioner for no apparent reason. As a result, Schuster argued, Petitioner hardly knew right from wrong. Schuster closed his remarks by saying that, in the years following 1976, Petitioner had become a productive member of his prison population. He obeyed the rules and even earned a GED.

2.

The State called sixteen witnesses in its case in chief. Together, they presented a case essentially identical to the case the State presented in 1976. A.F., then an adult woman, described how Petitioner abducted her, raped her, and then left her in the woods near a service station. On cross-examination, A.F. testified that she did not see Petitioner do anything to L.S. except tie her up and tape her mouth shut when he abducted her and L.S. and forced them into his car.

L.S.'s parents and A.F.'s mother testified. L.S. and A.F. were neighbors and good friends. L.S.'s father recalled that they often walked home from school together. In the evening of May 4, 1976, he identified his daughter's body at the hospital. L.S.'s mother said she was at home that day. When the girls did not come home from school on time, she looked for them and found A.F.'s books in the woods, which prompted her to call the school and the police. L.S.'s parents, her sister, and a cousin read victim impact statements to the jury.

A.F.'s mother met her daughter at the service station where A.F. went after running away from Petitioner. An ambulance was called, and A.F.'s mother

28

accompanied A.F. to the hospital. She waited there while A.F. underwent surgery to repair vaginal lacerations.

Vincent Giglio, a neighbor of L.S.'s and A.F.'s families, testified. He participated in a search for the girls. He found Petitioner's sleeping bag and rope in the woods.

Lee Moss, a lieutenant with the Cobb County Police Department in May 1976, testified. He and Detective Douglas Williams were the officers in charge of the case. He and Detective Williams met with A.F. at the hospital. She explained what had happened and where Petitioner had left her. With that information, Lieutenant Moss and Detective Williams were able to find Petitioner. Once they found him, Petitioner took the officers to L.S.'s body. The officers then placed Petitioner under arrest and brought him to the stationhouse where he gave a recorded confession, which was later transcribed. Moss read the entire confession into the record.[38] On cross-examination, he said that Petitioner confessed after waiving his rights to remain silent and have counsel present.[39]

---

[38] Among other things, Petitioner confessed that he raped A.F. and then told the girls to get dressed. At that point, L.S. took off running. Petitioner chased her toward a creek. He said, "I didn't really know why, but I just pushed her down into the creek and held her there. Well, she was kicking and trying to get out but I just held her there until she stopped kicking. Well, I figured she was dead and for some reason I didn't want to leave her in the creek, and that is the reason I carried her out of the creek and layed [sic] her down."

[39] Detective Williams testified at Petitioner's 1976 trial. By 1999, he had left the Cobb County Sheriff's Office and no longer lived in Georgia.

29

Morris Toler, a Cobb County detective in 1976, testified that on May 6 he searched the area around the scene of the crime for additional evidence. He found clothing, books, shoes, and a lunch box behind the Chattahoochee Elementary School.[40] He searched Petitioner's car, which was parked at Lois' apartment complex, and recovered Petitioner's binoculars. He searched Lois' apartment and found three pornographic books and a firearm in the headboard in Petitioner's bedroom. On cross-examination, Detective Toler conceded that a May 7 report that he drafted indicated that he had found the firearm in Lois' headboard, not Petitioner's. While acknowledging the incongruity, Detective Toler insisted that he had found the firearm in Petitioner's headboard.

The State called two physicians. Dr. William Layne, who performed A.F.'s surgery on May 4, and Dr. Joseph Burton, who conducted L.S.'s autopsy. Dr. Layne opined that A.F.'s lacerations were caused when "something . . . rapidly expand[ed] the vagina." He testified that lacerations like the ones suffered by A.F. "sometimes [happen] when a baby's head is coming through the vagina and it's too big for the vagina. It will tear the same type of laceration." Dr. Layne opined that "[s]omething had been in [A.F.'s vagina] and caused it to expand and tear." On

---

[40] A.F. and L.S. were not students at the Chattahoochee Elementary School; they attended the Richard B. Russell Elementary School. *See* note 13, *supra*. Detective Toler explained that he was searching for evidence near the Chattahoochee Elementary School because it was located near the service station that A.F. had run to after escaping Petitioner.

30

cross-examination, he conceded that he could not determine what had been inserted into A.F.'s vagina to cause the lacerations.

Dr. Burton opined that L.S.'s body indicated that she died during daylight hours, that she likely did not fall, that she inhaled water mixed with plant and sand material, and that her pelvis was under water. He noted that L.S. was wearing jeans that "were unzipped and unsnapped in front" and she was wearing "no underpants." He said that bruising on her neck was consistent with someone applying pressure on the neck area. He concluded that L.S. died by drowning after putting up significant resistance. In Dr. Burton's opinion, the forensic evidence was consistent with what Petitioner described in his confession (i.e., that he intentionally held L.S.'s head under water).

On cross-examination, Dr. Burton agreed that the forensic evidence could be consistent with Petitioner's theory that he did not intend to kill L.S. by holding her head under water. Dr. Burton added, however, that he would expect more abrasions on L.S.'s face had she had been running and simply fallen. Further, he would expect to find that L.S. had suffered one or more broken ribs had Petitioner fallen on top of her.

The State called two witnesses who had encountered Petitioner prior to May 4, 1976: Linda Brawner, whose children went to school with L.S. and A.F., and A.H., whom Petitioner assaulted on April 23, 1976. Brawner testified that she

31

saw Petitioner near her children's school on May 3. He was watching the children from his parked car. She saw him again on May 4, standing in a yard across the street from the school.

A.H. attended B.C. Haynie Elementary in Clayton County. In 1976, she was ten years old. On April 23, 1976, she was walking home from school when Petitioner grabbed her, slapped her, and threatened her with a knife. A.H. escaped his grasp and ran. Petitioner took off in the opposite direction. This was not the first time she saw Petitioner. A couple of days before, A.H. saw Petitioner standing near the spot where he would later grab her.

A.H. reported the encounter to the Clayton County Sheriff's Office. Detective John Robbins, who conducted a photo lineup with A.H., testified that she identified Petitioner as her attacker. The State published a Superior Court of Clayton County judgment establishing that on October 18, 1976, Petitioner pled guilty to a charge of aggravated assault with intent to rape A.H. and was sentenced to ten year's imprisonment.

Greg Ballard, senior counselor at the Georgia Diagnostic Prison, testified last for the State. He was Petitioner's counselor between 1995 and 1997. He testified that in 1996, Petitioner complained because the mailroom staff rejected a

32

book he had ordered, *Radiant Identities*.[41]  After the book was rejected, Petitioner

asked to see the standard operating procedures regarding "printed materials that

may or may not contain sexual, nonsexual photos, magazines, books with nudity of

adults or children, the issue being natural photos of children that are not sexual or

provocative."  On cross-examination, Ballard said that Petitioner was a low-profile

prisoner who stayed out of trouble.  He also agreed that the prison's safety

standards precluded children from entering the area where Petitioner was housed,

implying that Petitioner would pose no future risk to children if given a life

sentence.

During the presentation of its case in chief, the State introduced into

evidence several photographs, including photographs of the crime scene, L.S.'s

body, Petitioner's car, and his pornographic books.  Also received in evidence

were the rug Petitioner forced A.F. to lie on, maps of the area where the crimes

were committed, certified copies of Petitioner's convictions for vehicular theft in

the Superior Courts of Fulton County and DeKalb County, and a certified copy of

his conviction in the Superior Court of Marion County for contributing to the

_____

[41] Ballard testified that he had never seen a copy of *Radiant Identities*.  Excerpts of the book submitted into evidence by the State show that it is a photography book containing images of children.  A young girl is prominently pictured on the cover, a copy of which was submitted into evidence.  Wearing only pants, the girl's body is exposed from the waist up.  Another page of the book, which was submitted into evidence, contains an image of three children on a beach. Two are fully wrapped in beach towels.  The third child, a young girl, is also wrapped in a beach towel, but she is holding her towel open and, clothed in a one-piece swimsuit, her body is exposed.

delinquency of a minor.  Finally, in conjunction with Ballard's testimony, the State

introduced the forms Petitioner used to order books, the form rejecting *Radiant*

*Identities*, and the request he made for the standard operating procedures after the

prison rejected *Radiant Identities*.

3.

In Petitioner's defense, Defense Counsel called six witnesses: Dulcie

Shrider, Lillian Shepard, Lois and Willie Samples (Petitioner's stepfather),[42] Brian

Terry (Petitioner's son), and Robert D. Shaffer, Ph.D.

Dulcie Shrider, the District Records Manager for the Atlanta Public School

System, testified first.  Pursuant to a subpoena, she produced Petitioner's school

records and summarized what they disclosed.  Petitioner attended at least five

different schools, resided at several different addresses, and struggled to advance

from one grade to the next, often spending multiple academic years in the same

grade.  Petitioner's intelligence test scores disclosed a verbal IQ score of seventy-

four, a performance IQ score of ninety-six, and a full-scale IQ score of eighty-

three.

Lillian, Petitioner's aunt, testified next.  She said that she is seven years

older than Petitioner.  She said that when Lois gave birth to Petitioner (on

December 29, 1953), she and Lois were living with their parents and four of their

---

[42] *See* note 15, *supra*.

five siblings—Sarah, James, Peggy, and Brenda—in a duplex "out in west end on Norcross Street."[43]  Lois's husband, Delano, was in the Army, stationed in Japan. His tour there was short.  When he returned to Atlanta from Japan, Petitioner was about six months old.  Within a few days, he decided to take Lois and Petitioner to Michigan.  Before the year was out, he and Lois separated, and she and Petitioner returned to Atlanta and moved in with Lois's parents.  Lois's parents had a three-room apartment in Bankhead.  Also living in the apartment were Sarah, Peggy, James, Brenda, and Lillian.  Shortly after arriving in Atlanta, Lois got a job with a paper plant.

When Petitioner was two, Lois's parents, her siblings (except Mildred) and Petitioner moved to an apartment in another public housing complex in Atlanta. Lois could not move in with them because under the public housing rules, two families could not reside in the same apartment.  So, Lois lived elsewhere, leaving Petitioner with her parents.  She saw him on weekends.

Two years later, her parents and her siblings moved to a three-bedroom house, and Lois joined them.  They stayed there for a year, then moved to an apartment in a public housing complex.  Lois moved to an apartment near the paper plant, leaving Petitioner with her parents.  Soon thereafter, the family was

---

[43] Mildred, the oldest sibling, was living elsewhere at the time.

evicted from their apartment and Petitioner went to live with Lois. He was seven years old.

In roughly 1954, James was in a serious car accident. After that, Lillian recalled, he became violent, and for five years he sexually assaulted her and her sisters. According to Lillian, James and Petitioner "palled around" while they were living in the same home.

Lillian described her father as immature and dependent on her mother. When asked who parented Petitioner, Lillian said she did. She took care of him. Neither her father nor her mother was involved.[44]

Willie Samples ("Willie") and Brian Terry followed Lillian to the stand. Willie testified that he had known Lois since 1956; he married her in 1990. Since their marriage, Willie explained, he began going with Lois to visit Petitioner monthly. Terry said that he visited and wrote to Petitioner as frequently as he could. Both Willie and Terry told the jury that they valued having Petitioner in their lives.

Lois was the last lay witness to testify. Her testimony, as it related to Petitioner's upbringing, echoed much of what Lillian had said.

---

[44] Lillian reported that her sister Brenda died in 1984 and that her sister Sarah died in 1996.

36

Lois was born on January 26, 1936, the second of her parents' seven children. She dropped out of school at sixteen with an eighth-grade education. In March 1953, she married Delano, who was in the Army. Petitioner was born on December 29, 1953, while Delano was stationed in Japan. At the time, Lois was living with her parents and four siblings in a three-room apartment.[45] Shortly after Delano returned from Japan, she moved with him to Michigan, taking Petitioner with them. Less than three months later, she left Delano because he was seeing a woman in Michigan. Taking Petitioner with her, Lois returned to Atlanta and to her parents' apartment. In time, she got a job at a paper factory[46] and rented a room a block from the plant.

Before he was a year old, Petitioner rolled off the bed and hit his head on the floor.[47] Lois testified that because of the fall, her mother deemed Lois unfit for parenthood and took over, leaving Lois to work and raise money. She said that her father was not a father figure to Petitioner. James and Delano were the only other males in Petitioner's life.

---

[45] Lois testified that she and Petitioner shared a bed with Sarah. She also testified that she slept in the same bed as Petitioner until he was eight or nine years old.

[46] Lois worked ten and a half hours a day at the paper factory. She stayed employed there for almost forty-three years. At the time she was hired, the paper factory was called Atlanta Paper Company. When she testified in 1999, it was called Mead Inc.

[47] Lois told Bovee that Petitioner's fall happened when he was six weeks old. *See* part IV.A, *supra*.

Delano eventually came back into Lois's life; when Petitioner was thirteen, Lois and Delano remarried. Delano drank in excess and abused Lois and Petitioner repeatedly. Delano thought Petitioner was a sissy and would call him foul names. The remarriage failed and Delano departed.

Lois described Petitioner's school attendance and performance as poor. He dropped out of high school and soon was arrested for joy riding in a stolen car. Stealing cars, and consequent arrests, became habitual.

On cross-examination, Lois testified that her family had family reunions when Petitioner was very young. He attended them and seemed to enjoy himself.

Dr. Robert Daniel Shaffer testified last. He testified that in preparing to conduct a psychological evaluation of Petitioner, he compiled a summary of Petitioner's life history. In preparing the life history, he reviewed Petitioner's medical and education records and the data contained in the psychological tests he performed at the Jackson County Correctional Institution. He met with Petitioner at the Institution on three occasions for a total of fifteen to twenty hours. Petitioner's life history reflected the information Dr. Shaffer obtained from the investigators' reports and in interviewing Petitioner, his mother, and Lillian.

Dr. Shaffer presented Petitioner's life history in the context of four findings. First, Petitioner displayed signs of chronic brain syndrome or minimal brain dysfunction. Dr. Shaffer reached this diagnosis based on Petitioner's school

38

records.  The elementary school records revealed that Petitioner repeated some grades more than once.  Teachers suggested that he be placed in special classes for "mentally retarded" students.  They also noticed a delay in his social and emotional development as opposed to an intelligence problem.  He stayed in elementary school until he was fifteen.

Second, during his childhood, Petitioner lacked privacy and was exposed to confusing sexual boundaries.  Most of the time he was living in close quarters with several family members where sexual misconduct took place and people spoke about sex freely.  His uncle James molested at least three of James' sisters.  Dr. Shaffer explained that James' later conviction for having sex with his two daughters and forcing his son to have sex with his son's own mother indicated the "gravity and severity of the disorder that was present in" James.  Dr. Shaffer said that a possible explanation for Petitioner's aberrant behavior might be that it was caused by genetic factors—the same factors present in James' makeup.

The elementary school records indicated that teachers were concerned with Petitioner's knowledge and openness about sex.  Petitioner told Dr. Shaffer that he had a confusing relationship with Lillian, who would often act like his mother.  When his real mother would go to a dance and bring him and Lillian along, Lillian would act like his romantic partner.

Third, Petitioner's only male role models were either abusive or sexually deviant. James was molesting his sisters. Petitioner's father was the son of an alcoholic, habitually drank to excess, and physically and verbally abused Petitioner and his mother. Consequently, Petitioner learned that the only way to become a man was to assault his loved ones or commit sexually deviant acts.

Fourth, Petitioner was exposed to sexual and romantic fantasies while growing up. His maternal grandfather apparently kept pornographic material in the bathroom and expected Petitioner to view it. In time, Petitioner obtained from an adult bookstore pornographic books depicting adult men with young girls.

Dr. Shaffer also testified about the results of three psychological tests and two personality tests. The first psychological test, the Halstead-Reitan neuropsychological test, assessed whether Petitioner had sustained any significant brain injuries. Dr. Shaffer asked him to perform four tasks. He scored in the normal range on two. On the third task, his performance indicated that he had difficulty with comprehension and suffered from moderately severe brain impairment. On the fourth, Petitioner's score was consistent with mild brain impairment.

The second psychological test was the Wechsler Adult Intelligence Scale III test for intelligence. Petitioner's scores were in the borderline-to-low-average range of intellectual functioning but showed a significant discrepancy between

40

verbal processing and perceptual organization, which could mean brain dysfunction, hereditary factors, or some developmental issue.

The third psychological test, the Vineland Adaptive Behavior Scales test, determined Petitioner's ability to complete standard daily routines. His scores were equal to an average nine-year-old for communication, daily living, and socialization.

The two personality tests, the Dissociative Experiences Survey and the Rorschach Inkblot test, determine a person's awareness of reality. They revealed that Petitioner struggled with reality perception.

Considering Petitioner's life history and test results, Dr. Shaffer diagnosed Petitioner as having a pedophilic disorder. He also concluded that Petitioner suffered from minimal brain dysfunction, meaning that he had a developing nervous system that made him vulnerable to the environment in which he grew up—a deviant, hostile environment with blurred sexual boundaries.

On cross-examination, Dr. Shaffer described Petitioner's demeanor as immature and socially naive, albeit articulate. He agreed that Petitioner was not mentally retarded or below average intellectual functioning. Finally, Dr. Shaffer acknowledged that *Radiant Identities* was the type of book a pedophile would be attracted to.

41

During the presentation of Petitioner's defense, the Court had admitted into evidence a note Petitioner submitted requesting that his stepfather, Willie Samples, be added to his visitation list; multiple pictures of things he cross-stitched in prison; his marriage certificate; photographs of him as a child; court records related to James' child-molestation conviction; letters between Petitioner and his son, Brian Terry; and an article showing that Cobb County District Attorney Patrick Head opted not to block *Radiant Identities* from being sold at local bookstores. The Court also admitted several documents from Petitioner's school records, including his IQ test scores, report cards, letters sent home regarding discipline, a letter from the health department to a social worker recommending that he take special classes for the mentally retarded, and a psychological evaluation conducted while he was in eighth grade. Among other things, the evaluation indicated that Petitioner was functioning at the upper limits of the mentally defective level of intelligence and performing several years below his grade level academically.

The State, in rebuttal, called three witnesses. The first was Chuck Owen, the lead senior counselor at the Jackson County Correctional Institution where Petitioner was incarcerated from 1986 to 1990. Owen testified that he saw Petitioner frequently and described him as an articulate, personable, and normal adult. He recalled the scores Petitioner made on the Ebert test, a psychometric test that was routinely administered to Jackson inmates at the time. The Ebert test

measured IQ and behavioral patterns. Petitioner's scores were in the high range of normal. And Petitioner was able to earn a GED.

On cross-examination, Owen acknowledged that, while incarcerated, Petitioner tested at an eighth-grade reading level, a fourth-grade math level, and a sixth-grade writing level.

Robert Storms, Ph.D., a psychologist, followed Owen to the stand. Dr. Storms had evaluated Petitioner pursuant to a court order issued for the purpose of determining whether he was competent to stand the retrial of the penalty phase, whether he suffered from a mental illness, or whether he was "mentally retarded." He visited Petitioner in prison and reviewed documents related to his childhood, the police case file, and Dr. Shaffer's report. He noted that Petitioner had a troubled childhood and described him as coherent and rational.

Dr. Storms administered two tests: the MMPI-2 test and the Wechsler Adult Intelligence Scale III test. The MMPI-2 tested Petitioner's reality contact. Petitioner's score was perfect. The Wechsler test is an IQ test. Petitioner's verbal IQ score was seventy-eight and his performance IQ score was 109. According to Dr. Storms, an average on the test is anything from ninety to 100, and the seventy-eight to 109 disparity in verbal IQ and performance IQ signified an abnormality. He concluded that Petitioner suffered from Attention Deficit Disorder ("ADD"), which would have made it difficult for Petitioner to concentrate as a child.

43

Petitioner's school records were consistent with ADD, which, Dr. Storms explained, may have caused Petitioner to have a rich fantasy life.

Dr. Storms found nothing strange about Petitioner's speech, gait, or thought process. He found no evidence that Petitioner suffered any neurological damage from having fallen and hit his head as a child. He concluded that Petitioner was not psychotic, did not meet the threshold for "mental retardation," and was competent to stand trial.

On cross-examination, Dr. Storms said that he did not administer any tests relating to pedophilia or sexual deviance but agreed with Dr. Shaffer's diagnosis of pedophilic disorder.

Alisa Smith, M.D., a forensic psychiatrist, was the State's final rebuttal witness. Like Dr. Storms, she had evaluated Petitioner's competence to stand trial, mental illness, and "mental retardation" pursuant to a court order. She interviewed Petitioner for two hours. She prepared for the interview by reviewing records from the 1976 jury trial, Petitioner's school records, and Dr. Shaffer's report.

Petitioner presented no physical appearances outside the norm, was cooperative and non-threatening. Petitioner described an unexceptional childhood, although he performed poorly in school. Petitioner told Dr. Smith that he had many fond memories of his childhood, especially family get-togethers. He said that, in school, he got in trouble on purpose. He dropped out because

44

administrators told him he either had to stop cutting class or drop out. He struggled to hold a job and was arrested on multiple occasions for joy riding in stolen cars. Dr. Smith concluded that Petitioner's behavior was indicative of a conduct disorder.

The mental status exam showed that Petitioner's brain was functioning normally and that he had average intelligence. He evidenced no difficulty with reality, so Dr. Smith concluded that he was competent to stand trial. Her diagnosis was that Petitioner exhibited antisocial borderline personality traits, a personality disorder, which helped explain why he broke the rules and frequently made impulsive decisions as a child and young adult.

4.

With the evidence closed, the parties delivered their closing arguments to the jury. Parker spoke first for the State. He summarized the State's theory: Petitioner killed L.S. because she did not cooperate. He said that Petitioner's defense—that he was the product of bad genes and a bad environment—was not persuasive. The bad genes theory failed because Dr. Shaffer was not an expert in genetics. The bad environment theory failed because Petitioner had not endured any exceptional hardships, and everyone must endure some hardships in life. Parker dismissed the argument that Petitioner was only capable of functioning like a child by pointing to his sophistication in planning and carrying out the May 4, 1976 assaults. Petitioner

selected the elementary school, the victims, and wooded area where the assaults would take place; he stalked the victims; and he brought the items he needed to accomplish his objective. All of that, Parker said, showed that Petitioner was not functioning like a child when he committed the crimes.

Parker reminded the jury that it could not consider capital punishment unless it found an aggravating circumstance. He argued that the State proved three: (1) kidnapping with bodily injury, (2) torture, and (3) depravity of the mind. In short, Petitioner committed kidnapping with bodily injury when he sodomized A.F., torture when he killed L.S., and acted with depravity of the mind in forcing L.S. to watch him rape A.F. Last, he said that Petitioner's attempt to have *Radiant Identities* delivered to him while incarcerated showed that he had not changed; he was still a pedophile.

Head spoke next for the State. He called Petitioner a deceiver and argued that Petitioner tried to deceive others about L.S.'s death. The State's theory, he explained, was that L.S. did not die by accident. The marks on her body were the result of Petitioner's blows. L.S.'s zipper was undone and her pants were unbuttoned because Petitioner attempted to sexually assault her; she resisted, so Petitioner killed her.

Durham and Schuster delivered Petitioner's response. Their goal was to convince at least one juror to vote against a death sentence. Durham asked the

46

jurors to consider whether L.S.'s death was accidental and thus not susceptible to the death penalty. He drew their attention to Dr. Burton's testimony. Dr. Burton said that L.S.'s body showed no signs of sexual trauma. And the forensic evidence, taken as a whole, was consistent with an accidental drowning.

Durham addressed the State's burden to prove at least one of the three aggravating circumstances. He suggested that reasonable doubt existed as to the first aggravating circumstance, that Petitioner committed L.S.'s murder during the commission of kidnapping with bodily injury of A.F. Durham explained that the jury needed to decide whether the State proved, beyond a reasonable doubt, that A.F. suffered bodily injury as result of Petitioner's oral sodomy of A.F., and the jury could not consider bodily injury that resulted from Petitioner's rape of A.F.

Durham also suggested that a reasonable doubt existed as to the second and third aggravating circumstances, torture and depravity of mind. Urging against a finding of torture, Durham noted that L.S. put up a struggle and drowned in a relatively deep puddle of water, which would have sped up her drowning; that Dr. Burton's testimony showed that the forensic evidence was consistent with Petitioner's recitation of an accidental drowning; and that L.S. showed no signs of sexual trauma. Arguing against a finding of a depraved mind, Durham cited Dr. Smith's testimony that Petitioner suffered from a personality disorder that caused him to act impulsively, meaning L.S.'s drowning may have been an impulsive act

47

that Petitioner committed because things spun out of his control when L.S. ran away from him in the woods.

Schuster emphasized that Petitioner was diagnosed with pedophilia, a mental disorder, and that the disorder may have been caused by his genes. He pointed to James' sexual deviancy, said that it was in his genes, and argued that Petitioner may have inherited some of the same genes. Or his pedophilic disorder may have been the result of his environment—in particular, his exposure to James' sexual deviancy throughout his youth and his father's drunken rages. All of this explained Petitioner's behavior on May 4, 1976.

Schuster concluded his argument with a plea for mercy—on behalf of Lois and the other members of Petitioner's family.

5.

The Court charged the jury, including instructions on the three aggravating circumstances the State referred to in its opening statement, as well as mitigating circumstances. It instructed the jury that if the State established one of the aggravating circumstances beyond a reasonable doubt, it could return a death-sentence verdict after taking into account any mitigating circumstances the evidence disclosed. Absent an aggravating circumstance, its verdict would be life

imprisonment.[48]  The Court also instructed the jury that, whether or not it found that the State proved one or more aggravating circumstances beyond a reasonable doubt, it would still be authorized to impose a life-sentence verdict instead of a death-sentence verdict.

The jury sent the Court four written questions during its deliberation.  The jury asked the Court (1) to define aggravated sodomy, (2) to define bodily injury, (3) where it could find Petitioner's 1976 confession, and (4) whether parole would be an option for Petitioner if the jury imposed a life sentence.

At the conclusion of its deliberation, the jury found all three statutory aggravating circumstances beyond a reasonable doubt and returned a death-sentence verdict.

## IV.
### A.

After the Georgia Supreme Court affirmed his death sentence, *Presnell v. State*, 551 S.E.2d 723 (Ga. 2001), and the United States Supreme Court denied certiorari review, *Presnell v. Georgia*, 535 U.S. 1059, 122 S. Ct. 1921 (2002), Petitioner, on October 16, 2002, sought a writ of habeas corpus in the Superior

---

[48] Georgia's capital sentencing model does not require the jury to weigh the aggravating and mitigating circumstances in reaching its verdict whether to impose the death sentence or life imprisonment.  *Zant v. Stephens*, 462 U.S. 862, 873–74, 103 S. Ct. 2733, 2741 (1983) ("In Georgia, unlike some other States, the jury is not instructed to give any special weight to any aggravating circumstance, to consider multiple aggravating circumstances any more significant than a single such circumstance, or to balance aggravating against mitigating circumstances pursuant to any special standard." (footnote omitted)).

49

Court of Butts County.  His petition presented forty-three claims for relief from his convictions and death sentence.  One claim attacked the sentence on the ground that Defense Counsel's preparation for and presentation of his defense at the retrial failed to comply with the *Strickland v. Washington* performance standard in several ways.  One was the FASD claim: Defense Counsel were deficient in failing to discover that Petitioner suffers from FASD.  Petitioner presented the claim not in his petition but in a post-hearing brief.  Petitioner has since framed his FASD claim thus:

> [Defense Counsel] provided ineffective assistance by conducting a deficient investigation that failed to reveal the readily-available evidence of [Petitioner's] Fetal Alcohol Spectrum Disorder ("FASD") – which, as his well-qualified experts testified, is a devastating condition that causes profound organic brain damage and cognitive deficits that manifest in impaired decision-making, compromised mental functioning (sometimes to the degree of intellectual disability), and enhanced risk for developing problematic and deviant behaviors.
>  . . . .
> [Petitioner]'s FASD left him with severe physiological and psychological disabilities, permanently arresting the development of his mind, judgment, impulse control, and emotions at the equivalent of that of a child under the age of ten. These disabilities were exacerbated by his childhood exposures to poverty, physical abuse, sexual violation, and severe mental illness – a toxic combination of nature and nurture that caused him to develop the paraphilia that produced such tragic results in this case.

> Defense Counsel failed to discover that Petitioner suffered from FASD

because they

> missed the fact that his mother drank to excess while she was pregnant with him, causing [FASD], resulting in profound organic brain damage

50

and cognitive deficits. . . . [H]ad trial counsel learned about Petitioner's FASD and presented that to the jury, he would not have received the death penalty.

(quotation marks omitted).

Petitioner's support for this allegation consisted of an affidavit his mother executed on March 9, 2004 ("Affidavit"). The Affidavit was one of twenty-one affidavits Petitioner's habeas counsel presented to the Superior Court at the hearing it held on June 2, 2004.[49] The Affidavit contains forty-two numbered paragraphs. Five paragraphs refer to Lois' alcohol consumption:

14: [Delano and I dated for about 6 months and then we were] married in March of 1953 in Dallas, GA by a Justice of the Peace. . . . Delano drank when we dated but *I never grew up around drinking so I did not know what it could do to you.*

. . . .

16: I got pregnant . . . . In the evenings I would wait for Delano to come home but he was always out with his buddies drinking and meeting women. I would just have to sit at home, *while I was pregnant,* and *so I would have a few drinks by myself wondering whom my husband was with. I think sometimes I drank during this period just cause I was mad at Delano*. . . .

17: On some nights when Delano and I were at home *we would have a few drinks together too. Bourbon was my drink of choice. Although I did not drink the way Delano did, I was drinking during the entire time I was pregnant with Virgil.*

---

[49] In addition to the twenty-one affidavits, habeas counsel presented four investigative reports (including those of his experts on FASD, David Lisak, Ph.D., and Ricardo Weinstein, Ph.D.), and the trial court record and the District Attorney's file relating to the prosecution of *Presnell v. State*, Case No. 9-76-0603-28. One of the affiants, Petitioner, testified at the 1976 trial. Two testified at the 1999 retrial, Lois and Lillian.

51

18: One time *while I was still pregnant* Delano was out and I was real mad so I asked the neighbor to buy me a pint of bourbon. *I drank the whole pint of bourbon* and then the neighbor bought me another pint of bourbon. Delano came home and *he was upset that I had been drinking* and he started to jump on me. He was trying to get the bourbon bottle from me. I would not give him the bottle and I eventually threw the bottle in the middle of the street.

19: Delano and I were together for about five or six months and then he left for Japan. I had [Petitioner] on December 29, 1953. *I also smoked cigarettes while I was pregnant.* I smoked cigarettes from the age of 13 to 60. . . .

(emphasis added).

B.

During her investigation for mitigating evidence, mitigation specialist Bovee interviewed Lois in Atlanta on October 19 and 20, 1998.[50] She sent a memorandum about the interview to Durham, in which she said this about Lois's pregnancy and Petitioner's early childhood:

Lois said she had a normal pregnancy. Virgil was her first and only child. Forceps were used and she slept most of the time during her labor. She went into labor at 9 am and Virgil was born at 3:35 am. Virgil was bottle-fed. Lois smoked a pack a day all *during her pregnancy*. She stated that *she did not drink except socially*. He was born headfirst and weighed 7lbs. 14 oz. He was 21" long. Virgil was born at Crawford Long Hospital. When Virgil was 6 weeks old he fell off a changing table and his face was flattened, Lois said. His nose bled. Lois' mother threatened to take Virgil away from Lois due to her carelessness. Virgil stayed with his grandmother most of the time when

---

[50] On October 20 and 21, Bovee interviewed Petitioner in prison. On October 22, 1998, Bovee informed Durham about her interviews with Petitioner and his mother and explained that she "had Virgil's mother prepared to talk to Bob Shaffer when he calls."

he was little so Lois could work.  She would come get him on the weekend.

(emphasis added).

The members of the Defense Team were aware of what Lois told Bovee, that she did not drink during her pregnancy except socially.  But they did not know that she drank to excess "during the entire time [she] was pregnant with [Petitioner]." The Superior Court, in its order denying Petitioner's claims, did not comment on what the Defense Team may have known about Lois's drinking during her pregnancy beyond what Bovee reported in her memorandum.  The Superior Court simply found that Defense Counsel's investigation for mitigating evidence squared with *Strickland*'s performance standard.[51]

The Superior Court found that Schuster and Durham were well qualified to handle the capital proceeding.  They assembled an investigatory team that had extensive experience in gathering mitigating evidence.  In compiling Petitioner's life history, Dr. Shaffer examined records of Petitioner's birth, his schooling, medical history, mental health evaluations and criminal record.  He reviewed Bovee's reports of her interviews with Petitioner and his mother and spoke to Bovee about what she had learned.  After that, he interviewed Petitioner, Lois, and Lillian.  The information he gained in this way was reflected in the life history he

---

[51] The Superior Court made the finding on the basis of the facts set out in part III.B, *supra*, which we recite in part in the following text.

53

assembled. Finally, Dr. Shaffer conferred with Defense Counsel as needed. In reaching his diagnosis that Petitioner had a pedophilic disorder and minimal brain disfunction, Dr. Shaffer focused on, among other things, complications during Lois's pregnancy and Petitioner's birth and parental alcoholism.

Turning to the affidavits Petitioner introduced as proof that Defense Counsel's performance in connection with the penalty phase retrial was deficient under *Strickland*, the Court said this:

> The Court has thoroughly reviewed the affidavits submitted by Petitioner. The Court finds that much of the information gathered and presented in this challenge to Petitioner's conviction is cumulative of the information counsel gathered for Petitioner's re-sentencing hearing. The information contained that is not cumulative does not rise to a level of Constitutional concern. This Court finds that Petitioner's counsel conducted sufficient investigation into, and presentation of, mitigating evidence at Petitioner's re-sentencing trial. This Court finds that counsel's conduct falls within the wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment. Therefore, this Court concludes that Petitioner's claim that counsel failed to adequately investigate Petitioner's case is without merit.

The Superior Court denied Petitioner's habeas petition on December 27, 2005, and the Georgia Supreme Court denied his application for a certificate of probable cause to appeal on November 6, 2006.

### C.

On June 1, 2007, Petitioner turned to the Northern District of Georgia for relief. He presented forty of the claims the Superior Court had denied, including

54

the FASD claim, and petitioned the District Court to set them aside under 28 U.S.C. § 2254(d)(1) and (2) on the grounds that the Superior Court's adjudications of the claims were either contrary to, or an unreasonable application of, United States Supreme Court decisions, including *Strickland v. Washington*, or based on an unreasonable determination of the facts presented. The District Court discerned no basis for disturbing the Superior Court's disposition of any of Petitioner's claims under § 2254(d) and accordingly denied his petition.

The District Court denied Petitioner's FASD claim after considering it *de novo.* It considered the claim *de novo* because the Superior Court, in adjudicating the claim, made no explicit reference to the claim (which Petitioner presented initially in his post-hearing brief). The District Court looked to the core of the claim: Defense Counsel should have discovered what Lois revealed in her March 9, 2004 affidavit—that she drank during the entire time she was pregnant.

Here is what the District Court found: "[T]rial counsel's investigator [Toni Bovee] asked about Petitioner's mother's alcohol consumption during her pregnancy and she told the investigator that 'she did not drink except socially.'" Dr. Shaffer, in "assembl[ing] a complete history of Petitioner," centered on "complications during pregnancy" and "parental alcoholism." He "had access to Petitioner's mother, and he asked her about her pregnancy and her consumption of alcohol." She did not tell Dr. Shaffer of the drinking she described in her Affidavit

and he attached no significance to her statement to Bovee, that "she did not drink except socially."[52]

Notably, in a fax transmission to Durham on July 22, 1998, Dr. Shaffer had told Durham what his "neuropsychological and personality evaluation" of Petitioner would cover. Among other things, he said he would look into Presnell's mother's "pregnancy and birth complications," if any, and any "alcoholism" his mother or father had exhibited. Dr. Shaffer interviewed Petitioner's mother *after* receiving Bovee's report of her interview with her.

Assuming that Petitioner's behavior on May 4, 1976, was affected by the FASD, the District Court found Defense Counsel blameless in not discovering that he was suffering from the disorder. Indeed,

> [t]o the degree that Petitioner actually suffers from FASD, trial counsel could reasonably rely on his psychological expert to make such a diagnosis, and Petitioner cannot pin a failed or missed psychological diagnosis on his lawyers when he was subject to an intensive evaluation by a competent mental health expert.

Moreover,

> [g]iven the fact that three different teams of lawyers investigated Petitioner's background and had Petitioner put through thorough expert mental health evaluations without anyone identifying FASD, Petitioner's sudden claim of a missed FASD diagnosis simply cannot be blamed on trial counsel that represented Petitioner at the resentencing. This Court thus concludes that Petitioner has failed to

---

[52] These findings are implicit in the District Court's adjudication of the FASD claim and are consistent with the Superior Court of Butts County's findings, which the District Court was obliged to accord a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1).

56

establish a claim under [*Strickland v. Washington*] that his trial counsel was ineffective for failing to discover and present evidence regarding his purported FASD.[53]

After denying the Petitioner's claims in full, the District Court granted in part his application for a COA. It certified the FASD claim exactly as presented to the Superior Court of Butts County.

## D.

Petitioner's argument on appeal is that the District Court misapplied the *Strickland* performance standard in rejecting his allegation that Defense Counsel were derelict in failing to inquire into what Lois meant when she told Bovee that "she did not drink except socially" while pregnant.[54]

In his brief on appeal, Petitioner argues:

> Given Lois's admission that she drank "socially" during her pregnancy, no reasonable counsel would fail to inquire further into the extent of [Petitioner's] prenatal exposure to alcohol. Had counsel conducted a reasonable investigation, they would have learned the scope of Lois's drinking—which, in turn, would have alerted their expert to the need to explore whether [Petitioner] suffered from FASD. That evidence

---

[53] The Court was referring to the lawyers who represented Petitioner at his 1976 trial; the lawyers who prosecuted the habeas petition he filed in the Superior Court of Butts County on January 8, 1980, alleging that the 1976 trial counsel's handling of the mitigating evidence issue was constitutionally ineffective, *see* note 5, *supra*; the lawyers who filed the habeas petition in the Northern District of Georgia on May 15, 1985, *see* note 6, *supra*; and Defense Counsel who handled the 1999 retrial.

[54] Petitioner's brief on appeal presents an issue that was not included in the COA the District Court issued: Defense Counsel were ineffective for failing to object to statements Parker made on behalf of the State in his closing argument to the jury. We do not consider it. *See McClain v. Hall*, 552 F.3d 1245, 1254 (11th Cir. 2008) ("In an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the certificate of appealability." (alterations adopted) (quoting *Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998))).

would have allowed counsel and their expert to appreciate how [Petitioner's] organic brain damage amplified the impact of the sexual violence and deviance to which [he] had been exposed. So informed, they could have explained to the jury how his neurological development and background interacted to explain his crime, which would have given the jury the individualized picture of his culpability necessary to determine the proper sentence. [55]

As an initial matter, our analysis, like the District Court's, focuses on the

Butts County Superior Court's decision even though it is not the last state-court

---

[55] Lois's March 2004 Affidavit does not contain the admission that habeas counsel referred to in the excerpt above: that Lois drank socially during her pregnancy. Indeed, the Affidavit is to the contrary. It states that Lois met with Bovee and Defense Counsel on several occasions: once when Bovee came to Atlanta to interview Lois, then several times on the eve of trial when Lois met with Bovee and Defense Counsel at their law office or over dinner. Specifically, Lois said this in paragraph forty-one of her Affidavit, the penultimate paragraph:

> A woman named *Toni Bovee contacted me* prior to Virgil's last trial. She came to my house and *we talked about Virgil*. The next day I went up to her hotel and we talked again. I think we went out to lunch after we talked. *I saw her again at the lawyer's office with Lillian* right before the trial. Lillian, Willie Samples and I also had dinner together that night after I met Toni Bovee at the lawyer's office. *I met with the lawyers and Toni Bovee* right before the trial started. The lawyers would say, "If I asked you this what would you say?" and I would then answer what I said. This maybe took about a half an hour. *None of these people asked me* many questions about Virgil's problems in school, or *about how I drank while I was pregnant with him.* I would have been happy to answer any of their questions and testify in court about anything that I have said in this affidavit.

(emphasis added).

On none of these occasions, the Affidavit concludes, did Bovee or Defense Counsel ask her about her consumption of alcohol during pregnancy. Had they inquired, Lois claims, she would have told them what she said in her Affidavit: "I was drinking during the entire time I was pregnant with [Petitioner]."

Implicit in the Superior Court of Butts County's adjudication of the FASD claim is the finding that in 1998 Bovee did, indeed, ask Lois about prenatal alcohol consumption. The Superior Court of Butts County implicitly made this finding when it explained that Bovee interviewed Lois, collected a detailed family history from Lois, and learned that Lois smoked a pack of cigarettes a day and did not drink except socially during the time she was pregnant with Petitioner. We are obliged to afford that finding a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). A habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Under the circumstances here, Lois's statement that neither Bovee nor Defense Counsel asked her about her alcohol consumption does not qualify as clear and convincing rebuttal evidence.

58

adjudication on the merits. 28 U.S.C. § 2254(d). The Supreme Court of Georgia summarily denied Petitioner's application for a certificate of probable cause to appeal. That summary decision was the last state-court adjudication on the merits. Under *Wilson v. Sellers*, we "presume" that the summary denial adopted the same reasoning. 138 S. Ct. 1188, 1192 (2018). We thus "'look through' the unexplained decision" of the Supreme Court of Georgia and review the Butts County Superior Court's decision. *See id.*

To succeed on this appeal, Petitioner must establish that the Butts County Superior Court's decision was contrary to or involved an unreasonable application of *Strickland*. *Bell v. Cone*, 535 U.S. 685, 698–99, 122 S. Ct. 1843, 1852 (2002). Under *Strickland*, a petitioner must show that (1) his counsel's performance fell below the standard of objective reasonableness, and (2) his counsel's deficiency resulted in prejudice to the petitioner. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. When analyzing counsel's performance under *Strickland*, counsel is given broad deference. *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007). There is a strong presumption that counsel's representation was reasonable. *Id.* Petitioner "must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

When a petitioner argues that his counsel was ineffective during the penalty phase, we determine "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." *Stewart*, 476 F.3d at 1209 (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)). This test is objective and based on counsel's perspective at the time of the representation. "We must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Anderson v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 881, 904 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. 2065).

Counsel must be reasonable, not perfect or unrelenting. Effective counsel "is not required to 'pursue every path until it bears fruit or until all hope withers.'" *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) (quoting *Foster v. Dugger*, 823 F.2d 402, 405 (11th Cir. 1987)). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S. Ct. 2456, 2463 (2005).

Whether an investigation is reasonable largely depends on what information the defendant and others provide to counsel. *See, e.g.*, *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1330 (11th Cir. 2013); *DeYoung v. Schofield*, 609 F.3d 1260, 1286

60

(11th Cir. 2010); *McClain v. Hall*, 552 F.3d 1245, 1251–52 (11th Cir. 2008); *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1325 (11th Cir. 2002). For instance, a lawyer is not ineffective for failing to discover physical abuse when the lawyer asks petitioner and his family about abuse, and neither petitioner nor his family members mention physical abuse. *E.g.*, *Van Poyck*, 290 F.3d at 1325.

The prejudice element of *Strickland* is satisfied when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. 2068. *Strickland* is a conjunctive test, meaning that a petitioner must satisfy both prongs to succeed.

1.

We begin with the first prong of *Strickland*: Defense Counsel's objective reasonableness. Petitioner's case is analogous to *Nance v. Warden*, 922 F.3d 1298 (11th Cir. 2019). The petitioner's defense counsel in *Nance* consulted with the attorneys who represented petitioner at his original trial; reviewed all their files; hired multiple professionals to help with the mitigation investigation; interviewed witnesses about petitioner's childhood, mental health, and potential abuse; consulted with two mental health professionals; and reviewed school records, prison records, medical records, and more. *Id.* at 1301–02. On review, we

61

concluded that *Nance* "[was] as thorough an investigation into mitigating circumstances as we [had] ever seen." *Id.* at 1301.

Defense Counsel's investigation into mitigating evidence here, like the investigation we described in *Nance*, is about as thorough as any other investigation we have seen. Defense Counsel hired multiple professionals: a third attorney, McDaniel; an investigator, Pennington; a jury composition expert, Dr. Maykuth; and a mitigation specialist, Bovee. Defense Counsel hired two mental health professionals: a neuropsychologist, Dr. Shaffer, and a psychiatrist, Dr. Porter. Defense Counsel acquired and reviewed records from Petitioner's 1976 trial, maintained by the attorneys during the 1976 trial; records of the 1980 habeas corpus proceeding, including records of the mental health evaluations conducted for that proceeding; records associated with prior incarcerations and records related to Petitioner's incarceration following May 4, 1976, including records of mental health evaluations conducted at the prison; and school and medical records. Defense Counsel acquired and reviewed photos of Petitioner throughout his life. Defense Counsel consulted with attorneys who represented Petitioner in the *Presnell III* habeas corpus proceedings. Defense Team conducted several interviews; members of Defense Team interviewed Petitioner; Lois; Petitioner's former wife, Gilliland; Petitioner's son, Terry; Petitioner's aunts, Peggy and Lillian; Petitioner's cousin, Marie Wilerson; and one of Petitioner's former

62

victims, A.H.  Finally, Defense Counsel had Dr. Shaffer and Dr. Porter evaluate Petitioner's intelligence and mental health.

We are not persuaded by Petitioner's contention that Defense Counsel was objectively unreasonable for failing to elicit from Lois that she was binge drinking during the entire time of her pregnancy with Petitioner.  It took nearly twenty-eight years—from August of 1976 to March of 2004—for Lois's drinking to surface.  As the District Court observed, "three different teams of lawyers investigated Petitioner's background and had Petitioner put through thorough expert mental health evaluations without anyone identifying FASD."  Lois was there throughout. She was present in the courtroom for both trials, and she testified at both.  She was interviewed prior to the 1976 trial by defense counsel and presumably his investigator; she said nothing about drinking throughout her pregnancy to habeas counsel in 1980, when they sought a writ from the Superior Court of Butts County on the theory that Petitioner's attorney had been ineffective in marshaling mitigating evidence for the penalty phase of the 1976 trial (which would have included the FASD); and she said nothing to investigators Pennington and Bovee, or Dr. Shaffer or Defense Counsel when they interviewed her in preparing for the retrial of the penalty phase.

We have confronted and rejected analogous arguments in the context of defense attorneys who have failed to discover and present childhood abuse as

63

mitigating evidence. *See, e.g.*, *Williams*, 185 F.3d at 1237. We have explained that "[a]n attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." *Id.* Prenatal drinking, like childhood abuse, may be accompanied by shame and therefore kept secret. Thus, it may not be documented in medical or other records. Few likely know about the prenatal drinking. And it may be difficult to get an interview subject to admit to consuming alcohol in utero. As with childhood abuse, to hold counsel ineffective when counsel fails to elicit that his client's mother consumed alcohol while pregnant would present defense attorneys with an impossible task.

Even if we accept that Lois would have confessed to prenatal binge drinking if counsel asked what "socially" meant, Defense Counsel still acted reasonably. Defense Counsel and their experts had plenty of information with which to evaluate Petitioner. Not only did they have a wealth of information, Defense Counsel and their experts had access to Petitioner for further examination. Dr. Shaffer had Bovee's memorandum—the one indicating that Lois "did not drink except socially" while pregnant with Petitioner—before he examined Petitioner. Furthermore, Dr. Shaffer was invited to speak with Lois, and did speak with Lois, before he examined Petitioner. It was reasonable for Defense Counsel to rely on Dr. Shaffer to decide whether the Defense Team needed to inquire further about

64

Lois' "social" prenatal drinking. *See Rompilla*, 545 U.S. at 385, 125 S. Ct. 2463 ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."); *Williams*, 185 F.3d at 1237 ("[Effective counsel] is not required to 'pursue every path until it bears fruit or until all hope withers.'" (quoting *Foster*, 823 F.2d at 405)).

For the foregoing reasons, Petitioner fails the first prong of *Strickland*—counsel acted reasonably. "At the least, fair-minded jurists could so conclude, which is enough to satisfy AEDPA's highly deferential standards and preclude federal habeas relief." *Gissendaner*, 735 F.3d at 1330.

2.

We now turn to prejudice, the second prong of *Strickland*. Dr. Weinstein, one of Petitioner's expert witnesses,[56] diagnosed Petitioner with FASD. In reaching his diagnosis, Dr. Weinstein relied on what Lois said in her Affidavit, that she "drank alcohol for 'the whole time' that she was pregnant." Dr. Weinstein considered Lois a "binge drinker." According to his report: "[S]he was a binge-drinker, consuming large quantities of strong liquor in a very short period of time."

Had Defense Counsel uncovered Lois's prenatal binge drinking before Petitioner's 1999 penalty-phase retrial, they would have had to present testimony from Lois about her alcohol consumption in order to establish a predicate for Dr.

---

[56] *See* note 49, *supra*.

Weinstein—or an equivalent expert—to give an FASD diagnosis in court. Furthermore, because the diagnosis would have to rely on Lois's confession that she consumed alcohol during the entire time she was pregnant with Petitioner, the credibility of the diagnosis would depend on Lois's credibility. For the reasons discussed below, a jury would have been unlikely to believe Lois's claim that she drank alcohol during her entire pregnancy, and Petitioner can therefore not show prejudice.

If Lois drank throughout her pregnancy, if she was a binge drinker, someone in her family would have known about it. Throughout her pregnancy, she and the rest of her family lived in a three-room apartment. It had a front room with two large beds, one bedroom and a kitchen. Eight members of her immediate family stayed there: her parents; four sisters (Sarah, Patricia, Lillian, and Brenda); a brother, James; and her. During the first four or five months of her pregnancy, Delano was there too, raising the number of occupants to nine.

Delano's affidavit described the situation in these words: "Lois and I married shortly after we met and we moved into an apartment together. A couple of weeks after we married I went to work and returned home and her whole family had moved into our one-bedroom apartment." Lois's Affidavit was to the same effect: "We had two big beds in the front room, a half bed in the kitchen where James slept and another bed in the bedroom." While she was pregnant, five slept

in the front room: she and Sarah in one bed, Peggy, Brenda, and Lillian in the other.  What is more, in Lois's Affidavit, she said: "I never grew up around drinking."  With the family's environment in mind, it would strain credulity to say that Lois—a "binge drinker" according to Dr. Weinstein—drank "the whole time" she was pregnant and no one noticed.

Lillian gave habeas counsel an affidavit on February 9, 2004; Delano executed one two days later, on February 11, 2004.  Neither affidavit contains the words "alcohol," "drinking," "binge drinking," or "bourbon," Lois's "drink of choice."  This may explain why neither Pennington nor Bovee nor Dr. Shaffer nor Defense Counsel heard anything from any members of Lois's family about alcohol consumption in their household.  All they heard came from Lois—that she "did not drink during her pregnancy except socially."

Lois signed her Affidavit on March 9, 2004, twenty-seven days after Delano signed his and twenty-nine days after Lillian signed hers.  The close proximity of the signing of the three affidavits raises the inference that Lillian and Delano were unable to corroborate Lois's claim that she drank throughout her pregnancy. Lois's alcohol consumption was the key to Petitioner's FASD claim; if Lillian and Delano could have corroborated Lois's claim, habeas Defense Counsel certainly would have them swear to its truth.  By the same token, if Defense Counsel did not become aware of Lois's drinking until after February 11 (when Delano signed his

67

affidavit), they had time to obtain supplementary (or substitute) affidavits from Lillian and Delano. Defense Counsel did not, though. We therefore infer that given the extremely close living and sleeping arrangements in the three-room apartment on Norcross Street, if Lois was a "binge drinker" and drank bourbon (her alcohol of choice) "during the entire time [she] was pregnant," Lillian and Delano would have known of it. Lillian would have known about it because people did not drink alcohol in the Edwards household. As Lois put it, she "never grew up around drinking."

Had Defense Counsel put on testimony from Lois that she drank to excess during her pregnancy, followed by testimony from Dr. Weinstein that Petitioner suffers from FASD, the jury would have made the same connections we are making here. No one in Lois's family, who lived together in close quarters during the relevant time, can corroborate her alcohol consumption during pregnancy. If she were in fact drinking to excess at that time, the family would have known about it. The failure to produce any corroborating testimony destroys Lois's credibility.

\* \* \*

On this record, we would be hard put to say that the District Court erred in rejecting Petitioner's FASD claim. Petitioner failed to demonstrate that Defense Counsel's conduct in connection with the retrial of the penalty phase fell below

68

*Strickland*'s performance standard.  As for its prejudice standard, a retrial of the penalty phase would result in the same verdict, a death sentence.

The judgment of the District Court is

**AFFIRMED.**